Michael A. SASSANO, Plaintiff,

v.

CIBC WORLD MARKETS CORP., a Delaware corporation, Defendant.

C.A. No. 3066–VCL.

Court of Chancery of Delaware.

Submitted: Nov. 29, 2007.
Decided: Jan. 17, 2008.

87. *Tyson I,* 919 A.2d at 591.

Thomas G. Macauley, Esquire, Zuckerman Spaeder LLP, Wilmington, Delaware; Graeme W. Bush, Esquire, Zuckerman Spaeder LLP, Washington, D.C.; Shawn Naunton, Esquire, Zuckerman Spaeder LLP, New York, New York, Attorneys for the Plaintiff.

Kenneth J. Nachbar, Esquire, Jay N. Moffitt, Esquire, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware; Jonathan D. Polkes, Esquire, Richard L. Levine, Esquire, Matthew L. Mustokoff, Esquire, Weil Gotshal & Manges LLP, New York, New York 10153, Attorneys for the Defendant.

## OPINION

LAMB, Vice Chancellor.

In this case, an individual seeks from his former employer advancement of costs incurred in defending against five proceedings. The former employee was neither a director, nor an officer appointed by the board of directors; however, he maintains that the corporation's bylaws contain provisions entitling him to mandatory advancement. After trial in this case, for the reasons set forth herein, the court finds that the corporation's bylaws in this instance do extend mandatory advancement to the former employee.

## I.

Defendant CIBC World Markets Corp. ("CIBC") is a Delaware corporation with its principal place of business in New York, New York. Plaintiff Michael Sassano, a former employee of CIBC, seeks advancement under CIBC's bylaws for costs incurred in five proceedings:

- An investigation by the Division of Enforcement of the Securities and Exchange Commission pursuant to a formal order of investigation issued by the Commission on September 10, 2003, styled In the Matter of Certain Mutual Fund Timing Practices, NY–7220;

- An investigation by the New York Attorney General's Office of certain mutual fund market timing practices; [1]

- In the Matter of Michael Sassano, et al., an administrative enforcement proceeding before the Securities and Exchange Commission, File No. 3–12554;

- Proceedings before the New York Stock Exchange; [2] and

- Proceedings before the National Association of Securities Dealers. [3]

These claims allege that Sassano, while employed by CIBC from 1998 until the beginning of 2003, helped certain hedge fund clients of CIBC engage in frequent trading and market timing of mutual funds, in possible violation of federal and state securities laws.

Sassano avers he is entitled to mandatory advancement of costs incurred in the five proceedings under Article IX of the Bylaws. Article IX provides mandatory advancement to "officers with management supervisory functions." Article IV of the Bylaws, which is titled "Officers," discusses the powers and duties of two types of officers: executive officers and nominal officers. Sassano argues that although he was never an executive officer, he is entitled to mandatory advancement because at all relevant times he was a nominal officer, as that term is defined in Article IV of the Bylaws. He further maintains that nominal officers are "officers" of CIBC for purposes of mandatory advancement under Article IX of the Bylaws. Sassano then points to his management and supervision of a group of brokers as evidence that he exercised "management supervisory functions." Finally, Sassano argues that the claims brought against him are brought by reason of his officer status.

CIBC responds that Article IX extends mandatory advancement only to executive officers who are appointed by the board of directors, not nominal officers. In any event, CIBC says, Sassano was not a nominal officer. Further, CIBC contends, the term "supervisory" has a very specific meaning in the securities industry, that

---

1. In response to Defendant's First Set of Interrogatories, Sassano stated that "the investigation by the New York Attorney General's office of certain mutual fund timing practices has been completed." Def.'s Tr. Ex. 16 at 7.

2. In response to Defendant's First Set of Interrogatories, Sassano stated that "[o]n October 17, 2007, the NYSE Regulation Board of Directors issued a decision upholding the Hearing Officer's determination that Plaintiff violated NYSE Rule 476(a)," and that this decision "is not final." Id. at 7. NYSE Rule 476(a) states that a person subject to the jurisdiction of the Exchange may be sanctioned for refusing to comply with a request from the Exchange for his or her books and records. Sassano testified that the NYSE action was brought against him because he refused to testify in the Exchange's investigation into his mutual fund market timing. See Trial Tr. 95–96.

3. Compl. ¶ 9. In response to Defendant's First Set of Interrogatories, Sassano stated that "there are no ongoing proceedings before the National Association of Securities Dealers." Def.'s Tr. Ex. 16 at 7.

Sassano does not meet this definition, and therefore Sassano did not exercise "management supervisory functions." In addition, CIBC contests Sassano's argument that the proceedings have been brought against him by reason of his officer status.

## II.

CIBC is an indirectly owned subsidiary of Canadian Imperial Bank of Commerce, a financial and bank holding company incorporated and headquartered in Canada. At all relevant times, Canadian Imperial was organized into two separate structures.[4] First, in order to comply with the myriad regulatory regimes it encountered by virtue of being a global company, Canadian Imperial was organized by country, operating through subsidiaries incorporated in each country where it did business.[5] For example, in Canada, Canadian Imperial used CIBC World Markets Inc., a Canadian corporation, to act as its registered broker-dealer;[6] in the United Kingdom, Canadian Imperial used CIBC World Markets, plc, an English corporation;[7] and in the United States, the defendant in this action, CIBC, acted as Canadian Imperial's registered broker-dealer.

At the same time, Canadian Imperial was organized globally through several distinct marketing banners, or "strategic business units" ("SBUs").[8] These SBUs were structured along product lines, rather than by country, and cut across the Canadian Imperial subsidiaries globally. Thus, different divisions within the same Canadian Imperial subsidiary might belong to different SBUs.[9] For instance, the Private Client Services Division, a division of CIBC, belonged to the Wealth Management SBU ("Wealth Management"). Likewise, the Private Client Services Division of CIBC's British counterpart, CIBC World Markets, plc, belonged to Wealth Management. Other CIBC divisions, such as Investment Banking, along with their British counterpart, however, were in the World Markets SBU ("World Markets").[10] This framework enabled disconnected, individual subsidiaries operating in different countries but offering similar products to present themselves as one company.

At trial Sassano testified credibly as to his employment. He testified that he began working as a broker trainee with Oppenheimer Company in 1995.[11] By 1997, he had developed a mutual fund market timing business, and hired individuals to run his retail book while he attended to the mutual fund market timing.[12] The evidence also establishes that Sassano obtained an Executive Director title while with Oppenheimer, and that he retained this title when CIBC purchased his division in 1998.[13]

4. See Trial Tr. 157.

5. See id. at 104–105.

6. See id. at 158.

7. See id. at 158.

8. See id. at 103–104.

9. See id. at 157.

10. See Def.'s Tr. Ex. 5; Trial Tr. 104.

11. See Trial Tr. 6.

12. See id. at 8.

13. See id. at 6. CIBC argued at trial that Sassano had not established he held an Executive Director title after coming to CIBC. According to CIBC's own documents, however, Sassano held the Executive Director title from 1995 until 2003. See Pl.'s Tr. Ex. 6 at 3 (identifying Sassano's position title as "Executive Director" and "Executive Director–Investments," and indicating that he held this position beginning in June 1995); Pl.'s Tr. Ex. 18; Trial Tr. 196 ("Q. So it appears from this form [Sassano] was an executive director since 1996. A. [Annette Phillips]. Yes.").

After CIBC purchased his division in 1998, Sassano continued developing his mutual fund market timing business, and eventually managed and supervised a group of 14 individuals.[14] Sassano testified that, at all relevant times, he was responsible for hiring and firing employees,[15] ensuring that his budget satisfied staffing needs,[16] lobbying for budget increases,[17] orchestrating the group's investment strategies,[18] monitoring his employees' performance,[19] and deciding how much his employees were paid.[20] Sassano also testified that his supervisors often had to authorize, or "sign off on," certain of his decisions, especially with respect to hiring employees, opening new accounts, communicating with the public, and increasing his budget.[21] However, Sassano added that his requests were never denied,[22] and that

he did not report to anyone on a daily basis.[23]

The documentary evidence supports Sassano's testimony. For instance, in an email to Scott Abry,[24] Bob Okin,[25] and Dogan Baruh[26] dated October 17, 2001, Sassano described a recent new hire he made, stating "Michael King from mutual fund operations has accepted an offer from me and my team to join us."[27] Sassano asked that the approval of this hire be "expedi[ted]." Also, in a memorandum prepared for Sassano's Managing Director nomination materials, Abry wrote that Sassano was "a very effective leader and motivator to his staff of thirteen."[28] Abry also noted that Sassano had given "the more senior members" of his group "a[n] [ownership] stake to participate in the growth and expansion of the business."[29]

Further, Kathryn Casparian, Canadian Imperial's Chief Administrative Officer, testified that, like Sassano, she held an Executive Director title with Oppenheimer that followed her to CIBC. *See* Trial Tr. 100–101. Together, this evidence is sufficient to establish by a preponderance of the evidence that Sassano held an Executive Director title with CIBC from 1998 until termination of his employment with CIBC in 2003.

14. *See* Trial Tr. 9. Nomination materials for Sassano completed by World Markets Corp.'s Seth Novatt similarly note that "Mike's team consists of 13 professionals in addition to himself." Pl.'s Tr. Ex. 6. The team offered five basic product groups: mutual fund market timing, annuities trading, a retail book, middle markets institutional trading, and a "special products" group that dealt with unique investments such as 529 plans, a tax-advantaged savings plans designed to encourage saving for future college costs. 529 plans, legally known as "qualified tuition plans," are sponsored by states, state agencies, or educational institutions, and are authorized by Section 529 of the Internal Revenue Code. *See* An Introduction to 529 Plans, http://www.sec.gov/investor/pubs/intro529.htm (last visited Jan. 17, 2008).

15. *See* Trial Tr. 9, 12, 27.

16. *See id.* at 22.

17. *See id.*

18. *See id.* at 21, 42.

19. *See id.*

20. *See id.* at 23–24.

21. *See id.* at 14–16, 25, 54–57, 59–60, 66–67.

22. *See id.* at 26–27.

23. *See id.* at 15.

24. Scott Abry was the branch manager of Sassano's New York office. *See id.* at 29.

25. Bob Okin was Abry's and Sassano's supervisor. *See id.*

26. Dogan Baruh was Sassano's employee, and leader of the mutual fund market timing group. *See id.* at 10.

27. Pl.'s Tr. Ex. 1.

28. Pl.'s Tr. Ex. 7.

29. *Id.*

In 2002, Sassano received a Managing Director title. In connection with the process by which Sassano became a Managing Director, Annette Phillips [30] testified that first, Seth Novatt, one of Sassano's superiors and a CIBC officer and director,[31] submitted Sassano's name in early 2002 to what was called the World Markets Managing Directors Selection Committee (the "Selection Committee").[32] According to Phillips, the Selection Committee consisted of seven individuals, and was responsible for the initial vetting of Managing Director candidates, including Sassano.[33] Phillips further testified that in 2002, the year Sassano became a Managing Director, three of the seven Selection Committee members were CIBC employees: Tom Ortwein, Mike Higgins, and Bill Phoenix.[34] Phoenix was also an officer and director of CIBC.[35] Three other members were employees of CIBC World Markets, Inc.[36] The seventh individual was an employee of CIBC World Markets, plc.[37]

After the Selection Committee completed the initial vetting process, it passed Sassano's name on to the World Markets Management Committee (the "Appointing Committee"), which had final authority to confer the Managing Director title.[38] Not all candidates whose names were submitted to the Selection Committee were then forwarded to the Appointing Committee.[39] Phillips testified that the Appointing Committee was comprised of the head of World Markets [40] and the leaders of the different lines of business within World Markets.[41]

On April 24, 2002, David Kassie and Gerry McCaughey, Senior Executive Vice–President of Wealth Management,[42] sent an email to all World Markets and Wealth Management employees announcing the selection of 32 new Managing Directors, including Sassano.[43]

Less than a year later, in early 2003, Canadian Imperial sold Sassano's division to Fahnestock and Company, Inc., which was later renamed Oppenheimer. Upon consummation of the sale, Sassano ceased to be a CIBC employee and became a Fahnestock employee.[44]

---

**30.** Phillips testified that she has been directly involved in the Managing Director selection process since 2001. *See* Trial Tr. 160. She is currently a Canadian Imperial employee acting as World Markets's Vice–President of Human Resources.

**31.** *See* Pl.'s Tr. Ex. 31 at 4.

**32.** *See* Trial Tr. 193; *see also* Def.'s Tr. Ex. 10.

**33.** *See* Trial Tr. 160, 166; *see also* Def.'s Tr. Ex. 6.

**34.** *See* Trial Tr. 166.

**35.** *See* Def.'s Tr. Ex. 8 at 8.

**36.** *See* Def.'s Tr. Ex. 8 at 9; Def.'s Tr. Ex. 6; Trial Tr. 167.

**37.** *See* Trial Tr. 167.

**38.** *See* Trial Tr. 160; Def.'s Tr. Ex. 6.

**39.** *See* Trial Tr. 165, 192.

**40.** Casparian testified that Brian Shaw was the head of World Markets. *See* Trial. Tr. 118. However, Phillips identified David Kassie, a CIBC director, *See* Def.'s Tr. Ex. 8 at 3, as the head of World Markets. *See* Trial. Tr. 185.

**41.** *See* Trial Tr. 169. Phillips explained that although Sassano was a member of Wealth Management, Wealth Management had ceded the responsibility for selecting Managing Directors to the Selection Committee, and requested that Wealth Management make the decision as to who should receive the Managing Director title on their behalf. *See id.* at 165.

**42.** *See* Def.'s Tr. Ex. 5.

**43.** *See id.*

**44.** *See* Trial Tr. 6–7.

## III.

On September 10, 2002, the SEC opened a formal investigation into certain practices in connection with the trading of mutual funds under authority of the formal order of investigation styled *In the Matter of Certain Mutual Fund Timing Practices,* NY–7220.[45] The SEC subsequently opened numerous investigations under separate file numbers pursuant to the authority of the NY–7220 order. On January 29, 2004, the SEC opened an investigation into mutual fund trading practices at CIBC. Sassano was suspended from Oppenheimer around April 2004, and was constructively terminated around October 2004.[46]

On January 31, 2007, the SEC instituted proceedings against Sassano. Sassano made demand on CIBC for advancement on May 22, 2007, which CIBC denied on May 29, 2007. On July 2, 2007, Sassano brought this action seeking advancement of his legal fees.

The parties cross-moved for summary judgment. Both motions were denied at oral argument on November 29, 2007 due to disputed material facts concerning the manner in which Sassano obtained his Managing Director title. A one-day trial was held on November 29, 2007. This is the court's post-trial opinion.

## IV.

Section 145 of the Delaware General Corporation Law provides the statutory framework for when and how a corporation may provide advancement to an officer, director, employee, or agent of the corporation.[47] Among other things, Section 145 provides that "expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action. . . ."[48] Section 145 further provides that "expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate." In this case, the court looks to the terms of the Bylaws in order to determine advancement rights.

Corporations do not typically extend mandatory advancement rights to employees and agents, instead reserving such rights for directors and officers appointed by the directors. At first glance, the Bylaws seem to follow this common practice. Article IX, Section (c) of the Bylaws states that mandatory advancement is granted to those individuals who receive mandatory indemnification under Article IX, Section (a). Article IX, Section (a) extends mandatory indemnification to "officers with management supervisory functions and directors," as well as those who "serve another corporation, partnership, joint venture, trust or other enterprise at the request of [CIBC]," and are sued by reason of their office or service. Article IX, Section (b) extends permissive advancement to employees and agents, as Section 145 allows.[49]

---

45. *See In the Matter of Michael Sassano, et al.,* Securities Act Release No. 33,8865 (Nov. 30, 2007), *available at* http://www.sec.gov/litigation/opinions/2007/33–8865.pdf.

46. Sassano Dep. 13:17–24, Oct. 31, 2007.

47. *See 8 Del. C.* § 145.

48. *Id.*

49. *See* Bylaws Art. IX. Section (a) states that "the Corporation, to the full extent permitted by the laws of the State of Delaware as in effect at the time of the adoption of this Article IX or as such laws may be amended from time to time, shall indemnify any person . . .

Sassano concedes that he was not a director of CIBC or appointed to an officer position by vote of the board of directors. Nonetheless, Sassano asserts, the Bylaws contain idiosyncracies that grant him mandatory advancement rights. Specifically, Sassano points out that Article IV of the Bylaws, which is titled "Officers," identifies two types of officers: executive officers who are appointed by the directors,[50] and "nominal officers," as that term is defined in Article IV, Section 5. Section 5 states: "[a]ll other employees of the Corporation who have officer titles are, and shall be treated only as, departmental and divisional executives of the Corporation whose authority is limited and circumscribed to activities within their department or division and so designated by the President pursuant to Section 2 of this Article of these By-laws."[51] According to Sassano, a nominal officer is simply a CIBC employee who has an officer title. Sassano maintains that he met this definition at all relevant times. Further, Sassano points out, both executive and nominal officers are "officers" entitled to mandatory advancement under Article IX if they exercise management supervisory functions. Not surprisingly, Sassano also maintains that he served management supervisory functions.

Finally, Sassano asserts that the proceedings have been brought against him by reason of his status as an officer with management supervisory functions, and

therefore CIBC must advance legal fees he incurs while defending against them. In the alternative, Sassano argues that he served Wealth Management at the request of CIBC, is sued by reason of that fact, and is therefore entitled to mandatory advancement under Article IX.

CIBC raises five arguments in opposition. First, CIBC argues that the court should read the word "officers" in Article IX to include only executive officers, and not nominal officers. Second, CIBC maintains that, in any event, Sassano was not a nominal officer. Third, CIBC contends that the phrase "management supervisory functions" as used in the Bylaws means something very specific to the securities industry—namely, having passed certain NASD licensing exams. Sassano has not passed those exams, and, CIBC reasons, therefore could not have exercised management supervisory functions as that term is meant in the Bylaws.

Fourth, CIBC asserts that Sassano's officer titles were not necessary to carry out the activities alleged in the SEC actions, and therefore the SEC actions are not brought against Sassano by reason of his being an officer with management supervisory functions. Fifth, CIBC argues that Sassano did not serve World Markets at the request of CIBC because World Markets was not a real entity that one could serve. CIBC also argues that Sassano is not sued by reason of his service to World

---

50. Art. IX, Sec. (b).

51. The term "President" actually does not appear in Article IV, Section 2. It was most likely meant to refer back to the term "Chairman," which is found in Article IV, Section 2. As there is no material dispute about this ambiguity, for simplicity's sake, the court simply uses the term "President."

made or threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was an officer with management supervisory functions or a director ... or serves or served with another corporation, partnership, joint venture, trust or other enterprise at the request of the Corporation or any such constituent corporation." Section (c) states that those described in Section (a) are entitled to mandatory advancement.

Markets because (1) Sassano did not perform any functions for World Markets in addition to those he performed for CIBC, and (2) Sassano was sued for activities in which only a broker-dealer could engage, but World Markets was not a broker-dealer.

## V.

### A. *The Bylaws Extend Mandatory Advancement Rights To Nominal Officers*

■■■ "Corporate charters and by-laws are contracts among the shareholders of a corporation."[52] Therefore, the rules that govern the interpretation of statutes, contracts, and other written instruments apply to the interpretation of corporate charters and bylaws.[53] "The proper construction of any contract . . . is purely a question of law."[54]

■■■ When interpreting a contract, the court's ultimate goal is to determine the parties' shared intent.[55] Because Delaware adheres to the objective theory of contract interpretation,[56] the court looks to the most objective indicia of that intent: the words found in the written instrument. As part of this initial review, the court ascribes to the words their "common or ordinary meaning,"[57] and interprets them as would an "objectively reasonable third-party observer."[58] When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation.[59]

**52.** *Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del.1990); *Perlegos v. Atmel Corp.*, No. 2320, 2007 WL 475453, at *26 n. 184 (Del.Ch. Feb. 8, 2007).

**53.** *See Centaur Partners*, 582 A.2d at 928; *Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del.Ch.2007); *see also Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del.Supr.2001) (citing *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del.1983)); *Sundlun v. Executive Jet Aviation, Inc.*, 273 A.2d 282, 285 (Del.Ch.1970).

**54.** *Rhone–Poulenc Basic Chemicals, Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992).

**55.** *See Matulich v. Aegis Commc'ns Group, Inc.*, No. 2601–CC, 2007 WL 1662667, at *4 (Del.Ch. May 31, 2007) (citing *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del.1996)); *Brandywine River Prop., LLC v. Maffett*, No. 2655–VCN, 2007 WL 4327780, at *3 (Del.Ch. Dec. 5, 2007).

**56.** *See Seidensticker v. Gasparilla Inn, Inc.*, No. 2555–CC, 2007 WL 4054473, at *2 (Del.Ch. Nov. 8, 2007) (hereinafter *"Seidensticker II "*) (explaining that Delaware adheres to an objective theory of contracts, and that recent Supreme Court decisions have done nothing to alter that tradition); *see also Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, No. 15388, 1997 WL 525873, at *4 (Del.Ch. Aug. 13, 1997).

**57.** *Cove on Herring Creek Homeowners' Assoc. v. Riggs*, No. 02024–S, 2005 WL 1252399, at *1 (Del.Ch. May 19, 2005) (citing *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *9 (Del.Ch. Apr. 29, 2005)).

**58.** *Seidensticker II*, 2007 WL 4054473, at *2; *Liquor Exchange, Inc. v. Tsaganos*, No. 19312–NC, 2004 WL 2694912, at *2 (Del.Ch. Nov. 16, 2004); *Demetree v. Commonwealth Trust Co.*, No. 14354, 1996 WL 494910, at *4 (Del.Ch. Aug. 27, 1996) (citing *City Inv. Co. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del.2006); *Rhone–Poulenc*, 616 A.2d at 1196; *Seidensticker v. Gasparilla Inn, Inc.*, No. 2555–CC, 2007 WL 1930428, at *3 (Del.Ch. June 19, 2007) (hereinafter *"Seidensticker I "*); *W.L. Gore & Assoc., Inc. v. Wu*, No. 263, 2006 WL 2692584, at *15 (Del.Ch. Sept. 15, 2006).

**59.** *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997); *Seidensticker I*, 2007 WL 1930428, at *3 (citing *Rhone–Poulenc*, 616 A.2d at 1196).

Article IX of the Bylaws provides mandatory advancement to "officers with management supervisory functions." CIBC argues that the court should read the word "officers" in Article IX such that mandatory advancement is extended only to executive officers, and not nominal officers. The fallacy in this argument, however, is that the Bylaws themselves define the word "officers." Specifically, Article IV, titled "Officers," identifies two categories of officers: executive officers and nominal officers. When interpreting the word "officers" in Article IX, the court naturally turns to Article IV for guidance and reads the word "officers" in Article IX as including the nominal officers identified in Article IV.

The court's reading is confirmed by Article IX's usage of the phrase "management supervisory functions." This phrase would seem unnecessary were Article IX to apply simply to executive officers, as executive officers are members of senior management and, one would think, always have management supervisory functions. Thus, it makes most sense to read the phrase "officers with management supervisory functions" as an attempt to limit the universe of nominal officers entitled to advancement.

CIBC advances two reasons that the court should read the term "officers" in Article IX as referring only to executive officers, and not nominal officers. First, CIBC argues that nominal officers are, by definition, officers in name only, and therefore do not have the rights of executive officers, including mandatory advancement rights under Article IX. Second, CIBC points out that Section 5 states that "nominal officers are ... to be treated as departmental executives." CIBC argues

that "executives" are different from "officers," and therefore nominal officers should not be treated as officers entitled to advancement.

CIBC's arguments are not sound; they are based on the incorrect assumption that Section 5 evinces an intent to limit both the scope of nominal officers' rights, as well as the authority of nominal officers to bind the corporation. An honest look at Section 5 reveals that the limiting phrases in that section relate only to the authority of nominal officers to bind the corporation, not the rights nominal officers enjoy upon receipt of the title. Thus, nominal officers are nominal in the sense that they do not have an executive director's authority to bind the corporation, and Section 5 reads: "[a]ll other employees of the Corporation who have officer titles ... shall be treated only as ... executives ... whose authority is limited and circumscribed...." Despite CIBC's parsing of Section 5's language, CIBC cannot overcome the fact that Section 5 simply says nothing about the rights of nominal officers. If CIBC intended to restrict nominal officers' advancement rights, it could have easily done so by including clear language to that end.

### B. *Sassano Was A Nominal Officer At All Relevant Times*

Having found that the Bylaws extend mandatory advancement to nominal officers, the question becomes whether Sassano was a nominal officer of CIBC from 1998 to 2003, the time frame of the allegations for which he seeks advancement. The interpretation of the term "nominal officer" is a question of law, while the question of whether Sassano meets that definition is one of fact.[60] Sassano, who seeks to enforce rights under the

---

60. *See Petrolane Inc. v. Texas E. Corp.*, No. 18854, 2003 WL 21999420, at *1 (Del.Ch. Aug. 22, 2003).

Bylaws, bears the burden of persuasion in demonstrating that the Bylaws entitle him to mandatory advancement.[61] The burden of persuasion with respect to the existence of advancement rights is a "preponderance of the evidence" standard.[62] Thus, in order to prevail, Sassano must establish by a preponderance of the evidence that, from 1998 until 2003, he was a nominal officer as that term is used in Article IV, Section 5 of the Bylaws.

Section 5 is quite clear how an individual becomes a nominal officer of CIBC. First, an individual must be an employee of CIBC. Second, that employee must have at least one officer title. The Bylaws make no indication that only certain types of employees with officer titles can be nominal officers (such as non-brokers), or that certain reasons for receiving the officer title (for instance, as a reward for high performance) exclude an individual from being a nominal officer. There is no requirement that the officer title be held with CIBC, rather than some other entity. Significantly, the phrase "of the Corporation" appears after the word "employee," but not after "officer titles." This exclusion suggests that CIBC employees need not hold their officer titles in CIBC in order to be nominal officers of CIBC.

Moreover, although CIBC argues that there is a requirement that nominal officers be appointed by the President, this simply misreads Section 5. As an initial matter, the mere fact that CIBC maintains that there is no record of any nominal officer ever having been designated by the President undermines the credibility of its interpretation.[63] More importantly, as stated, the purpose and effect of Section 5 is to circumscribe the authority of nominal officers, i.e., "to activities within their department or division." Section 5, then, is best read as limiting the authority that nominal officers possess. "[Nominal officers] are, and shall be treated only as, departmental and divisional executives of the Corporation whose authority is ... so designated by the President...."

It is uncontested that Sassano became an employee of CIBC in 1997, when CIBC bought Oppenheimer, and that he was a CIBC employee until January 2003, when CIBC sold Sassano's group to Fahnestock. Additionally, Sassano held two officer titles during that time, Executive Director and Managing Director. Therefore, Sassano was a nominal officer at all relevant times.

The conclusion would be the same even were the court to find that Section 5 requires a nominal officer to hold that title with CIBC and be appointed by the President. Any suggestion that Sassano held his titles with Wealth Management rather than CIBC is incorrect. Although there seems to have been an organizational hierarchy within Wealth Management and World Markets, these SBUs were unincorporated, non-legal entities with no employees, no payroll, and no revenue of any sort.[64] CIBC has conceded as much.[65] It

---

61. *See id.* at *5.

62. *United Rentals, Inc. v. RAM Holdings, Inc.,* No. 3360, 2007 WL 4591849, at *18 n. 112 (Del.Ch. Dec. 21, 2007) (citing *Carlson v. Hallinan,* 925 A.2d 506, 524 (Del.Ch.2006)).

63. *See* Trial Tr. 116, 149.

64. *Compare* Pl.'s Tr. Ex. 9 (identifying Kassie as the Vice–Chairman of World Markets) *with*

Pl.'s Tr. Ex. 36 at 3 (identifying Kassie as an employee of CIBC World Markets, Inc.).

65. In arguing that Sassano could not have served Wealth Management at the request of CIBC, CIBC argues that Wealth Management is so diaphanous an entity that it cannot be described as an "enterprise," much less a corporation or partnership, that Sassano served at CIBC's request. *See* Def.'s Pre–Trial Br. 26–27.

makes no sense in such a circumstance to find that Wealth Management conferred officer titles, or that individuals held officer titles within it.

Instead, it is more reasonable to find that CIBC allowed Wealth Management (via World Markets and its Appointing Committee) to select who would become a Managing Director, and then conferred the title upon its employee. Senior management within CIBC nominated Sassano to the position and acceded to Sassano's use of the title. Moreover, CIBC was the ultimate beneficiary of Sassano's Managing Director title; the title undoubtedly helped Sassano bring in new clients, thus affecting CIBC's, and no one else's, bottom line. Simply put, Sassano held his Managing Director title through his employer, CIBC, because there is no other entity in which Sassano could have held this title.[66]

Further, in light of the evidence, it is improbable that Sassano's designation as a Managing Director occurred without the President's consent. Sassano has established that CIBC's senior management condoned, encouraged, and participated in the Managing Director selection process. Phoenix, who was both a director and offi-cer of CIBC, sat on the Managing Director Selection Committee.[67] Novatt, a CIBC officer and director,[68] nominated Sassano to be a Managing Director.[69] Kassie, another CIBC director,[70] sent out the email notifying the company of Sassano's new title.[71] Combined with the lack of evidence, such as the President's testimony, that the President did not delegate his allegedly exclusive authority to appoint nominal officers,[72] these facts are enough to show by a preponderance of the evidence that Sassano was appointed by the President, either directly or by delegation.

The same is true with respect to Sassano's Executive Director title, the existence of which Sassano established by a preponderance of the evidence.[73] In the absence of any evidence to the contrary, the court can only assume that the President was involved in granting the Executive Director title, either directly or by delegating the authority to someone else.

Nonetheless, CIBC argues that the Branch Office Manager's Supervisory Manual[74] states that brokers who receive officer titles based on production, like Sassano, are not corporate officers.[75] There-

66. Although there was little evidence as to how Sassano received his Executive Director title, the same reasoning applies to that title.

67. See Def.'s Tr. Ex. 8 at 8; see also Def.'s Tr. Ex. 6 at 3.

68. See Pl.'s Tr. Ex. 31 at 4.

69. See Trial Tr. 193; see also Def.'s Tr. Ex. 10.

70. See Def.'s Tr. Ex. 8 at 3.

71. See Def.'s Tr. Ex. 5; Trial Tr. 185.

72. Phillips and Casparian did testify that the President neither delegated to the Appointing or Selection Committees his alleged power to appoint nominal officers, nor appointed the members of those committees. See Trial Tr. 116–18, 119–20, 168. However, both wit-nesses testified that this was only "to the best of their knowledge." Trial Tr. 117, 168–69. Further, Casparian testified she did not know who served on the Selection Committee, See Trial Tr. 149–50, so the basis for her testimony is unclear. And neither witness testified or seemed to know about how Executive Directors were appointed. See Trial Tr. 149–51.

73. See supra note 13.

74. See Def.'s Tr. Ex. 13.

75. "In fact, the Manual applicable to Sassano's branch office explicitly differentiates be-tween corporate officers and individuals who hold non-officer titles, including managing and executive directors: 'Brokers who have earned a title based on production must at all times qualify the title with the word 'Invest-

fore, although it does not disagree that "Managing Director" and "Executive Director" are officer titles,[76] CIBC concludes Sassano is not an officer under the Bylaws. Additionally, CIBC maintains that Sassano received no new authority or responsibility upon receiving his titles, and that "[s]urely, one would think that when a person becomes a corporate officer, that person's responsibilities and authority would change."[77]

With regard to CIBC's first argument, aside from being parol evidence that the court cannot properly consider,[78] the Manual is unhelpful. First, there is no evidence that the version of the Manual presented at trial was the version in place at the time the Bylaws were adopted.[79] Second, the particular language CIBC references from the Manual instructs branch office managers how to supervise their brokers' communications with the public.

To that end, the Manual states only that supervisors should make sure that brokers add the word "Investments" to the end of their officer title when dealing with the public in order to avoid the appearance of having the authority of a corporate officer.[80]

This language, like Section 5 of the Bylaws, restricts the authority of nominal officers to bind the corporation, and says nothing of the rights of nominal officers. Indeed, Casparian testified that she wrote the Manual and included this language "[b]ecause ... we were very concerned that the public would misconstrue a person's level of authority, and we wanted to try to avoid any appearance of apparent authority."[81] Thus, the Manual's limiting language does not help the court determine who is or is not a corporate officer; it merely articulates the (alleged) authority

ments' (e.g., 'Executive Director–Investments') in order to avoid the appearance of being a corporate officer.' " Def.'s Pre–Trial Br. 19 (citing Manual at 26).

**76.** CIBC would be hard pressed to argue that the titles are not officer titles. First, Article IV of the Bylaws (again, titled "Officers") provides: "The Board of Directors may also elect or appoint ... one or more Managing Directors, one or more Executive Directors...." In addition, CIBC's own board minutes identify numerous Managing Directors as "officers." See Pl.'s Tr. Ex. 10–14. And, in *Flynn v. CIBC World Markets Corp.*, No. 976–N, 2005 WL 1538337 (Del.Ch. June 21, 2005), Patricia Bourdon (the then-Corporate Secretary for CIBC) testified that both Managing Director and Executive Director are officer titles and that, by virtue of their status, these titles give the holder the power to bind CIBC.

Interestingly, the title "Director" is not listed as an officer title in Article IV. Thus, there is a question whether CIBC's numerous employees who have the unqualified "Director" title are nominal officers. Because Sassano held the Executive Director and Managing

Director titles, however, this question need not be decided in this case.

**77.** Def.'s Pre–Trial Br. 19.

**78.** *See Cincinnati SMSA*, 1997 WL 525873, at *4 ("[Delaware] opinion[s] have ... clarified when this Court may refer to extrinsic evidence to assist interpretation of contract terms. When the words of an agreement are not subject to different interpretations and when the words do not otherwise create ambiguity when viewed in the light of other contractual provisions, this Court will not consider extrinsic evidence to interpret the meaning of the agreement.").

**79.** *See* Trial Tr. 123. ("Q. At what point in time did you write [the Manual]? A. I wrote it, I believe, before Oppenheimer had been acquired by CIBC, and *then it was modified as regulations changed or as procedures or policies changed.*") (emphasis added); Trial Tr. 145; *see also* Trial Tr. 101 ("A. Shortly after [CIBC] acquired [Oppenheimer], they revised the by-laws.").

**80.** *See* Manual at 26.

**81.** Trial Tr. 124.

of a certain class of nominal officers to bind the corporation.

Finally, the fact that Sassano's responsibilities and authority did not change upon receiving his officer titles is completely consistent with his being a nominal officer. Indeed, this was the purpose of Section 5: to create a class of "nominal" officers with no authority to bind the corporation.

### C. Sassano Had "Management Supervisory Functions"

▮▮▮ Sassano was an officer as that word is used in Article IX. The question remains, however, whether Sassano had management supervisory functions. CIBC argues that the word "supervisory" is not defined in the Bylaws, and is therefore ambiguous. CIBC then argues that parol evidence should be used to clarify the meaning of the word "supervisory," and that, according to that parol evidence, Sassano did not have "supervisory" functions.

CIBC identifies two sources of parol evidence. First, CIBC looks to industry usage, specifically the meaning of "supervisor" found in the context of securities licensing requirements. It argues that in this context, the word "supervisor" applies only to those who have passed a supervisor-level licensing exam such as a Series 8 [82] or Series 63 exam. Because he had not passed such an exam, CIBC says, Sassano could not exercise "management supervisory functions." [83]

Similarly, CIBC argues, the court should look to the Manual for guidance on the meaning of "management supervisory functions." The Manual states that "[a]ll employees functioning in a supervisory capacity must be Series 8 and Series 63 registered at a minimum" and includes a list of supervisory functions that only the branch manager can perform. These functions include:

- approving a broker's use of discretion over customer accounts;
- approving a broker's outside investment activities and brokerage accounts;
- authorizing formal disciplinary action over brokers, including a formal reprimand, suspension without pay, and termination of employment;
- formally presenting registered representative applicants to the Firm's Hiring Committee in special circumstances;
- approving requests by registered representatives to operate and perform brokerage services off-site or outside the branch office; and
- reviewing and responding to customer complaints and approval for monetary settlements with customers.[84]

CIBC then points out that Abry, Sassano's branch manager, had a Series 8 license and could perform all of the supervisory functions listed in the Manual. Sassano, however, lacked this license and could not take these actions. Therefore, CIBC argues, Abry and others identified on a list of branch managers[85]—not Sassano—performed the management supervisory functions at Sassano's branch office.

---

**82.** This exam has since been renamed the Series 9/10. For ease of reference, the court refers to the exam as the "Series 8" exam.

**83.** CIBC similarly suggests that Sassano did not exercise supervisory functions because the SEC charged only Abry, and not Sassano, with supervision violations. The underlying assumption of this argument remains that one

can have management supervisory functions only if one is a "supervisor" as defined in securities law.

**84.** Manual at 94.

**85.** *See* Def.'s Tr. Ex. 14.

In addition to improperly relying on parol evidence,[86] CIBC's interpretation of "management supervisory functions" is unreasonable. First, the operative words in the Bylaws are the phrase "management supervisory functions," not the singular term "supervisory." It is unreasonable to define the phrase "management supervisory functions" by reference to the industry-specific meaning of the tangentially related word "supervisor." Second, the industry-specific definition of the term "supervisor" and the language cited from the Manual[87] identify only one type of supervision a broker-dealer encounters, namely regulatory, not business, supervision.[88] That Sassano did not perform every type of "supervisory" function extant in a broker-dealer does not mean that he exercised no supervisory functions at all. If CIBC had intended to equate the phrase "management supervisory functions" with the industry-specific meaning of the word "supervisor" or the word "supervisory"

found in the Manual, it should have made that clear in the Bylaws.

Based on the plain meaning of the phrase, Sassano clearly exercised "management supervisory functions," as Casparian admitted.[89] According to the documentary evidence and Sassano's testimony, Sassano made hiring decisions, firing decisions, set his employees' salaries, and disciplined members of his group, a group that at any given time consisted of approximately 14 individuals.[90] Further, it is completely coherent to find that Sassano exercised management supervisory functions even though he needed approvals in order to implement some of his decisions. In fact, as Casparian testified, even Abry needed approval from his superiors to hire someone.[91]

Finally, the court disagrees with CIBC that, as a practical matter, Sassano did not exercise management supervisory functions because he spent time living in Monaco, Florida, and Russia—not in New York where his branch office was located.[92] As

**86.** A term is not ambiguous simply because it is not defined. *See United Rentals*, 2007 WL 4591849, at *19 n. 113; *Fidelity & Deposit Co. of Maryland v. Delaware Dept. of Admin. Serv.*, 830 A.2d 1224, 1231 (Del.Ch.2003) (stating that "although the term 'award' is not defined by the DUAA, it is not ambiguous either . . ."); *Cincinnati SMSA*, 1997 WL 525873, at *4 (finding that a term was not ambiguous simply because the contract offered an "incomplete" definition). Nor can parol evidence such as industry usage be used to create ambiguity. *See Halliburton Co. v. Highlands Ins. Group, Inc.*, 811 A.2d 277, 280 (Del.2002); *Knight v. Caremark Rx, Inc.*, No. 1750, 2007 WL 143099, at *1 (Del.Ch. Jan. 12, 2007). Rather, ambiguity exists only "[w]hen the words of an agreement are . . . subject to different interpretations and when the words . . . otherwise create ambiguity when viewed in light of other contractual provisions. . . ." *Cincinnati SMSA*, 1997 WL 525873, at *4.

**87.** The court again points out that it is unclear that the Manual produced at trial was

even in place at the time the Bylaws were adopted. *See supra* note 79.

**88.** *See* Trial Tr. 133. ("The Court: [When Abry was reviewing diaries of a day's trading in the Private Client Division], he wouldn't be looking at them to determine, from a business point of view, whether a client was productive or not productive or a rep was productive or not productive. The Witness: That would not be a supervisory function, but that would be a business function.").

**89.** *See* Trial Tr. 129. ("Q: Did Mr. Sassano manage his team? A. Yes; in the generic sense of the word, not in the securities industry sense of the word.").

**90.** *See supra* Part II.

**91.** *See* Trial Tr. 137.

**92.** Sassano testified that, from 1998 until 2001, he lived in Florida, and in Monaco, England, and Russia from 2001 until 2003. *See* Trial Tr. 41–43. He testified that this

Sassano testified, the ubiquitous Blackberry has changed the way business is run, enabling managers to remain involved in the day-to-day affairs of their business from afar.[93] Sassano's physical absence from New York in no way makes it "hard to imagine" how he nonetheless performed management supervisory functions over his team of brokers.

In sum, the Bylaws provide mandatory advancement to employees of CIBC who hold officer titles (not necessarily with CIBC or through appointment by the President), and have management-level supervisory duties. Sassano is such an employee.

### D. Sassano Is Sued "By Reason Of" Being An Officer

 CIBC argues that even if Sassano is a nominal officer with management supervisory functions, he could have engaged in the conduct alleged in the SEC actions [94] without his officer titles, and he is therefore not being sued by reason of his officer status, as Article IX requires.[95]

CIBC also argues that the SEC is suing Sassano for wrongdoing alleged to have been committed in his capacity as a "registered representative," rather than any activities relating to management supervisory functions. In support, CIBC notes that, unlike his superiors, Abry and Okin, Sassano was not charged by the SEC with any failure to supervise violations under Section 15(b)(6) of the Exchange Act.

In *Homestore v. Tafeen,* the Delaware Supreme Court held that "if there is a nexus or causal connection between any of the underlying proceedings ... and one's official capacity, those proceedings are 'by reason of the fact' that one was a corporate officer, without regard to one's motivation for engaging in that conduct." [96] Under this standard, the SEC actions have been brought against Sassano by reason of his officer status. According to CIBC's own documents, Executive and Managing Directors were to organize and implement a large business, which in Sassano's case meant organizing and conducting a large number of mutual fund trades.[97] That is exactly the conduct for which the SEC

---

enabled him to more easily raise new assets and serve potential and current clients. *See* Trial Tr. 43.

93. Sassano explained that during this time he managed his business remotely, and described his typical day as taking client meetings in the morning and afternoon. In the late morning to early afternoon, Sassano would contact his traders and review the previous day's production with them, and identify new assets raised or trade errors. *See* Trial Tr. 42.

94. CIBC does not contest that the other proceedings, including the NYSE action, are brought "by reason of" the fact he was an officer with management supervisory functions. However, the court would have little trouble finding that they bear the same relation to his officer role as the SEC action. *See* Trial Tr. 95.

95. CIBC further argues that Sassano receives advancement only if he is sued by reason of

being a nominal officer, and that he is a nominal officer of Wealth Management. Thus, according to CIBC, Sassano must be sued for conduct he took in his capacity as a nominal officer of Wealth Management in order to receive advancement. However, CIBC argues, Sassano is sued for conduct he engaged in as a registered broker-dealer. Because Wealth Management is not a broker-dealer, CIBC concludes, the conduct for which Sassano is being sued could not have been taken in his capacity as a nominal officer of Wealth Management. The court disagrees. As explained above, Sassano did not hold his title with Wealth Management. He held his title with CIBC, which is a registered broker-dealer. CIBC's argument fails for that reason alone.

96. 888 A.2d 204, 215 (Del.2005).

97. *See* Pl.'s Tr. Ex. 8; Manual at 26.

sued him. Paragraph 11 of the Order Instituting Proceedings states:

> Sassano created a large and successful market timing business in which he executed mutual fund orders on behalf of his customers—large market timing hedge funds. Sassano's market timing business became so successful, it made him one of the top-producing RR's at World Markets.[98]

Further, the Bylaws simply require that Sassano be sued by reason of being an officer with supervisory functions, not necessarily for acts he took in his management supervisory role. Therefore, it is irrelevant that Sassano was not charged with any failure to supervise violations under Section 15(b)(6) of the Exchange Act.

### E. Alternatively, Sassano Is Sued By Reason Of Serving Another Enterprise At CIBC's Request

██ In addition to officers with management supervisory functions and directors, Article IX of the Bylaws provides mandatory advancement to an individual who "serves or served with another corporation, partnership, joint venture, trust or other enterprise at the request of the Corporation or any such constituent corporation." As an alternative holding, the court finds that if Sassano held his Managing Director title with Wealth Management rather than CIBC, he would be entitled to advancement because he is being sued by reason of serving another enterprise at CIBC's request.

Clearly World Markets is, if not a legal entity, an "enterprise." This position is more tenable than CIBC's, which would have this court hold that Wealth Management exists at two extreme ends of a spectrum—substantive enough to confer officer titles to individuals, but not substantive enough to be an "enterprise." In contrast, this alternative holding characterizes World Markets as being concrete enough to both constitute an enterprise, and grant officer titles.

Moreover, Sassano served World Markets at the request of CIBC. As previously explained, Novatt, one of Sassano's superiors and an officer and director of CIBC, nominated him to the Managing Director position, and other senior CIBC managers were aware of and participated in the Managing Director selection process. Sassano then served World Markets by going out into the marketplace and conducting business using the World Markets name.

CIBC argues that the SEC actions are not brought against Sassano by reason of the fact he served Wealth Management at the request of CIBC. First, CIBC points to Sassano's deposition testimony and discovery responses in which Sassano testified that he was not aware of providing services to a third party distinct from those provided to CIBC. Second, CIBC argues that Sassano is sued for activities in which only a registered broker-dealer could have engaged. Since World Markets was not a registered broker-dealer, CIBC reasons, Sassano is not being sued by reason of his service to World Markets.

CIBC's first argument lacks merit. It makes no difference that Sassano's duties did not change, or that he did not provide services distinct from those provided to CIBC. The fact remains that he conducted business as a Managing Director of World Markets. This constitutes "service." Further, as previously discussed, Sassano is sued by reason of that business, and is therefore sued by reason of his service. CIBC's latter argument similarly lacks merit. That World Markets was not a registered broker-dealer does not mean

---

**98.** Def.'s Tr. Ex. 1.

that Sassano could not have engaged in broker-dealer activity on its behalf. Rather, it merely establishes that World Markets engaged in activity in which only a registered broker-dealer should have engaged.

## VI.

For the reasons stated above, Sassano's claims for advancement of costs incurred in defending against the five proceedings defined herein and indemnification of reasonable attorneys' fees and expenses incurred in prosecuting this complaint[99] are GRANTED. Sassano shall submit a form of final judgment and order, upon notice, within 7 days.

---

99. Sassano was wholly successful in this litigation, and is therefore entitled to all reasonable fees he incurred in bringing it. *See* Bylaws, Article IX (stating World Markets will indemnify Sassano "to the full extent permitted by the laws of the State of Delaware ...”); *see also Fasciana v. Electronic Data Sys. Corp.,* 829 A.2d 178, 184 (Del.Ch.2003) (holding that a plaintiff awarded advancement after litigation "should only be entitled to an indemnification of those expenses reasonably proportionate to the level of success he achieved" in the litigation).