[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 14, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-13273

_____

D. C. Docket No. 06-00662-CV-GET-1

KOCH BUSINESS HOLDINGS, LLC,

Plaintiff-Counter-Defendant-Appellee,

versus

AMOCO PIPELINE HOLDING COMPANY,

Defendant-Counter-Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(January 14, 2009)**

Before TJOFLAT and MARCUS, Circuit Judges, and VINSON,* District Judge.

_____

* Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida,
sitting by designation.

TJOFLAT, Circuit Judge:

Amoco Pipeline Holding Company ("Amoco") and Koch Business Holdings ("Koch") entered into a purchase agreement, pursuant to which Koch agreed to pay Amoco $295 million as a base payment for Amoco's shares in a corporation. Koch also agreed to pay an extra $5 million subsequent to closing upon the occurrence of specified conditions. After closing, Koch took the position that the conditions had not been fulfilled and refused to pay the $5 million. Amoco maintained that the conditions had been fulfilled and demanded payment. Koch sought to resolve the contractual dispute by instituting an action for a declaratory judgment. Amoco countered with a claim for breach of contract. The district court granted Koch summary judgment. Amoco now appeals.

I.

Amoco and Koch each owned shares in Colonial Pipeline Company ("Colonial"), which transported petroleum products throughout the Southeastern United States. Stock interests in Colonial were subject to a right of first refusal, meaning that before a shareholder could dispose of its interest, it had to offer its shares to Colonial's shareholders on the terms of its intended sale.[1]

---

[1] Section 4 of the Owners Agreement provides that if a Colonial shareholder desires to sell its shares, "[t]he remaining Owners shall then have first options to purchase all such Shares and Interests, but not less than all (at the price and on the terms stated in the said notice) . . . ."

In early 2002, Amoco decided to sell its Colonial shares, which represented 17.97% of the company's outstanding shares, and began negotiations with Buckeye Partners, L.P. ("Buckeye"), a company that held no interest in Colonial. The negotiations were complicated by Colonial's potential environmental liabilities. On June 26, 1996, a Colonial pipeline had leaked near Reedy River, South Carolina, and, on November 28, 2000, the U.S. Department of Justice ("DOJ"), on behalf of the U.S. Environmental Protection Agency ("EPA"), filed a lawsuit against Colonial ("the Reedy River litigation"). By the time Amoco decided to sell its shares, Colonial and the DOJ were engaged in settlement negotiations. Although Colonial estimated that its liability might reach as high as $130 million, the company believed that the case would settle for around $40 million. It prepared for this liability by self-insuring, accruing a litigation reserve by withholding from the profits normally set aside for shareholder dividends funds sufficient to pay a settlement or, failing settlement, a money judgment.[2]

The uncertainties of the Reedy River litigation and the litigation reserve made it difficult for Amoco and Buckeye to negotiate a fixed price for Amoco's shares. Buckeye expressed concern that Colonial might ultimately settle for an

_____

[2] During the first two quarters of 2002, Colonial's Board of Directors accrued $8 million for the litigation reserve. In September 2002, the Board considered accruing $17 million but compromised on $7 million, deciding to delay the accrual of the additional $10 million until the fourth quarter.

amount greater than its litigation reserve. If that occurred after closing, the shareholders then of record would bear the burden of the unreserved liability via reduced dividends. To the extent Colonial accrued the reserve prior to closing, Amoco (and its co-shareholders) would bear such burden.

During a telephone call on October 1, 2002, Amoco's counsel suggested that Amoco and Buckeye share the risk of the uncertainty through a contingent, post-closing payment. Buckeye would pay Amoco a fixed price of $295 million for its shares. Buckeye would pay an additional $5 million after closing if either of two conditions occurred. The first condition was that Buckeye would pay the $5 million if Colonial settled with the government for less than $40 million. The second condition was that Buckeye would pay the additional $5 million if Colonial settled for between $40 and $50 million and financed more than $10 million of the settlement by reducing the fourth quarter dividends by that amount.

On October 2, Amoco and Buckeye entered into a written purchase agreement based upon the guidelines worked out during the October 1 call.[3] Buckeye would pay Amoco a base purchase price of $295 million for its shares and $5 million after closing contingent upon the occurrence of one of the two

---

[3] The agreement was subject to the Colonial shareholders' right of first refusal to purchase Amoco's stock on the terms and conditions Amoco and Buckeye had agreed upon.

conditions set out in Schedule 3A of the agreement.  The first, contained in section (ii), stated that the payment would be due if:

> (1) Colonial accrues as an additional reserve an amount less than or equal to [$10 million] for the quarter ending December 31, 2002 . . . , which accrual results in a reduction of the aggregate dividends paid by Colonial to its shareholders for such quarter of an amount of no less than such accrued amount, <u>and</u>
>
> (2) . . . the amount to be paid by Colonial in full satisfaction of [the] judgment or settlement [in the Reedy River litigation was] less than [$40 million].

The second, contained in section (iii), stated that the payment would be due if:

> (1) Colonial accrues as an additional reserve an amount greater than [$10 million] for the quarter ending December 31, 2002 . . . , which accrual results in a reduction of the aggregate dividends paid by Colonial to its shareholders for such quarter of an amount of no less than such accrued amount, <u>and</u>
>
> (2) . . . the amount to be paid by Colonial in full satisfaction of [the] judgment or settlement [in the Reedy River litigation was] less than [$50 million].

The same day, Amoco sent notice of the agreement to Colonial's other shareholders, in honor of their right of first refusal.

On October 24, Koch, as another Colonial shareholder, exercised its right of first refusal to buy Amoco's shares, and, on November 1, Koch and Amoco executed a purchase agreement containing the same terms and conditions as the agreement Amoco had negotiated with Buckeye.  On December 16,  Koch paid

5

Amoco the $295 million base purchase price, and Amoco transferred its shares to Koch.

In the meantime, the Reedy River litigation was coming to a resolution. At a December 12 meeting, Colonial's Board of Directors voted to accrue $10 million for the litigation reserve in anticipation of a settlement. The accrual would be funded from the dividends that otherwise would be paid to Colonial's shareholders. On December 31, Colonial issued the fourth quarter dividends, reduced by $10 million, to Amoco and its other shareholders.

On January 17, 2003, Colonial and the DOJ agreed in principle to the settlement of the Reedy River litigation for $34 million. Because it wished to pay the entire settlement out of the litigation reserve, Colonial's Board of Directors, on the same day, accrued $9 million more for the reserve. Although this accrual took place in 2003, it was recorded on the company's books as a contingent liability expense for the fourth quarter of 2002 pursuant to Generally Accepted Accounting Principles ("GAAP") because it occurred prior to the publication of Colonial's 2002 financial statement.[4] On April 1, 2003, Colonial and the DOJ entered into a formal settlement agreement on the terms they had agreed to earlier. On April 21,

_____

[4] The district court found that "[t]he reserve was increased by $9 million in January 2003 and recorded on Colonial's books 'for the quarter ending December 31, 2002.'"

6

Amoco sent Koch a demand for the $5 million post-closing payment.  Koch

refused to pay.

## II.

On May 18, 2005, Koch sued Amoco, seeking a declaration that the parties'

agreement did not require it to pay the $5 million that Amoco was demanding.[5]

Amoco answered Koch's complaint and filed a counterclaim for breach of

contract.  On August 15, 2006, after discovery closed, the parties filed cross-

motions for summary judgment.  In support of its motion, Koch argued that the

amount accrued for the litigation reserve "for the quarter ending December 31,

2002" was $19 million.  This included the $10 million the Board of Directors

accrued at its December 12 meeting and the $9 million it accrued on January 17,

after Colonial and the DOJ had agreed to a settlement in principle.   According to

Koch, because Colonial accrued a total of $19 million for the fourth quarter but

reduced the fourth quarter dividends by only $10 million, the condition set out in

Schedule 3A (iii) that the fourth quarter accrual result in "a reduction of

[Colonial's fourth quarter] dividends . . . of an amount of no less than such

---

[5]  Koch brought the suit in a Kansas state court.  On July 25, 2005, Amoco removed the case to the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1441(a).  The district court had diversity jurisdiction pursuant to § 1332(a).  On March 14, 2006, the district court entered an order transferring the case to the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a).

accrued amount" was not fulfilled. Therefore, it did not owe Amoco the post-closing payment.

Conversely, Amoco argued in support of its motion that the amount accrued "for the quarter ending December 31, 2002" did not include the $9 million accrual the Board of Directors voted for on January 17, 2003. Rather, the fourth quarter accrual only amounted to $10 million, the amount by which the fourth quarter dividends were reduced; the Schedule 3A (ii) condition was met; and Koch was obligated to pay.

On March 27, 2007, the district court, noting that it was not disputed that the litigation "reserve was increased by $9 million in January 2003 and recorded on Colonial's books 'for the quarter ending December 31, 2002,'" granted Koch's motion for summary judgment and denied Amoco's. The court held that the amount accrued "for the quarter ending December 31, 2002" included the January 17, 2003 accrual and thus amounted to $19 million. Because Colonial had reduced the 2002 fourth quarter dividends by only $10 million, the condition set out in Section 3A(iii) had not been met.

### III.

In this diversity action, the parties expressly agreed that their purchase agreement would be "governed by and construed and enforced in accordance with

8

the laws of the State of Delaware without regard to the rules on choice of law thereof." We therefore apply Delaware law to resolve this dispute.

Under Delaware law, "when interpreting a contract, the role of a court is to effectuate the parties' intent." AT&T Corp. v. Lillis, 953 A.2d 241, 252 (Del. 2008)(quotation omitted). Under Delaware's objective theory of contract interpretation, a "court looks to the . . . words found in the written instrument" to ascertain that intent. Sassano v. CIBC World Mkts. Corp., 948 A.2d 453, 462 (Del. Ch. 2008). The court interprets these words according to their "common or ordinary meaning" from the point of view of an "objectively reasonable third-party observer." Id. Even the literal meaning of a contract must be rejected if it "would be clearly unreasonable and yield an arbitrary result." Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); see also Beanstalk Group, Inc. v. AM Gen. Corp., 283 F.3d 856, 860 (7th Cir. 2002) ("[A] contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek.").

The dispute in this case hinges on the interpretation of one provision in the purchase agreement: "accrues as an additional reserve for the quarter ending December 31, 2002." Koch argues that the January 17, 2003 accrual is an accrual

9

"for the quarter ending December 31, 2002," because it was recorded, pursuant to GAAP, as a fourth quarter expense on Colonial's financial statements. We disagree and hold that the parties did not intend to classify accruals occurring after December 31, 2002 as accruals "for the quarter ending December 31, 2002."

It is clear from the plain language of the purchase agreement that accruals "for the quarter ending December 31, 2002" do not include accruals made in January 2003. The date ending the quarter, December 31, appears on the face of the contract; had the parties wished to specify a different date, they could easily have done so. Koch relies on GAAP to argue that the January 17 accrual should be considered an accrual for the fourth quarter of 2002. GAAP does not define default legal rules, however, see Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broadcasting Corp., 906 A.2d 218, 226–27 (Del. Ch. 2006)(holding that a change in GAAP treating preferred stockholders as holding debt rather than equity does not affect the stockholders' standing to sue the corporation in the capacity of a creditor for a fraudulent conveyance), and nowhere in the contract do the parties agree that the terms will be interpreted according to GAAP. Although GAAP is potentially relevant to contract interpretation where there is ambiguity regarding intent, it is not relevant here, where the intent is clear on the face of the agreement.

Furthermore, treating fourth quarter accruals as including an accrual made

after the fourth quarter dividend has been determined and distributed makes no sense. Under such an interpretation, the purchase agreement would provide for the post-closing payment only if Colonial redetermined, i.e., reduced, the dividend already paid by the amount of the subsequent accrual. Surely, the parties did not contemplate that the shareholders would turn back dividends they had already received merely because Colonial's financial statement for the fourth quarter had not yet issued and the accountants, applying GAAP, treated the January 17 accrual as having been made in December. Suppose the financial statement had issued. What then? Would Koch agree that whether it paid the post-closing $5 million payment turned on the timing of the issuance of the fourth quarter financial statement? We think not. In sum, a fourth quarter accrual made after the fourth quarter dividend was determined and distributed could not have, in the words of Schedule 3A, "result[ed] in a reduction of the aggregate dividends paid by Colonial." Accordingly, Koch's argument that the January 17 accrual should be taken into account fails.

We interpret accruals "for the quarter ending December 31, 2002" to encompass only those accruals made on or before December 31, 2002. Under this interpretation, Colonial accrued $10 million for the fourth quarter of 2002 and reduced the fourth quarter dividends by the same amount. The Schedule 3A (ii)

11

condition was therefore met, and Koch is liable for the $5 million post-closing payment.

V.

For the foregoing reasons, the judgment of the district court is reversed and the district court is directed to enter judgment for Amoco on its counterclaim.

REVERSED, with instructions.