# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

RAMON ROMAN JR.,             )
                                     )

       Plaintiff,              )
                                     )

       v.                   )     C.A. No. CPU4-12-003627
                                     )

FANTASY LANE THOROUGHBRED,   )
RACING STABLE LLC, and         )
ROBERT L. HUTT              )
                                   )

       Defendants.          )

Submitted: August 4, 2014
Decided: October 10, 2014

Paul E. Bilodeau, Esquire
Losco & Marconi, P.A.
1813 N. Franklin Street
P.O. Box 1677
Wilmington, DE 19899
*Attorney for Plaintiff*

Martin D. Haverly, Esquire
1011 Centre Road
Suite 117
Wilmington, DE 19805
*Attorney for Defendant*

## DECISION AFTER TRIAL

**SMALLS, C.J.**

This is a breach of contract action arising from a partnership agreement between Plaintiff and Defendants regarding a thoroughbred racehorse. Plaintiff brought suit alleging that Defendants failed to distribute funds to Plaintiff as provided in the agreement. Trial was held on August 4, 2014.

At the conclusion of the trial, the Court reserved decision and ordered the parties to submit post-trial briefs addressing the following issues: (1) whether the facts and evidence support a claim for breach of contract; (2) what damages are recoverable by Plaintiff should the Court determine that a breach occurred; and (3) whether there is a basis for an award of attorney fees under the bad faith exception to the American Rule.

It is undisputed that an agreement existed between the parties. The Court is called upon to determine whether Defendants have breached this agreement. This is the Court's final decision after trial.

**FACTS**

In May 2008, Defendant Robert Hutt ("Hutt") acquired R. Betty Graybull ("RBG"), a young female racehorse, for $60,000.00. Shortly thereafter, Hutt and predecessor entities of Defendant Fantasy Lane Thoroughbred Racing Stable, LLC ("Fantasy Lane") raised $150,000.00 by selling thirty shares of RGB for $5,000.00 per share, representing 3% interest per share.[1]

On May 13, 2008, Roman acquired 2¼ shares (6.75%) of RBG by entering into a partnership agreement ("the Agreement") with Fantasy Lane. In 2010, Roman acquired an

---

[1] At trial, Hutt testified that in 1999, he started Fantasy Lane Stable, Inc. with former horse trainer, Alan Seewald ("Seewald"). The Agreement in dispute was between Fantasy Lane Stable, Inc. and Roman. In 2010, upon Seewald's demise, Fantasy Lane Stable, Inc. began operating under Fantasy Lane Thoroughbred Racing Stable, LLC, and Hutt, acting on behalf of Fantasy Lane Stable, Inc., conveyed RBG to Defendant Fantasy Lane.

2

additional ¾ share, thereby increasing his ownership to 3 shares (9% interest). Roman retained this interest up until RBG retired from racing.

## A. The Terms of the Agreement

Under the Agreement, Hutt served as the General Manager, representing the management team's interest. As the General Manager, Hutt had the sole exclusive authority to "make all customary and reasonable decisions required in the day-to-day management" of RBG, including whether to enter her into a race or sell her.[2] The Agreement concluded with a vague catchall provision, giving Hutt "exclusive authority" to decide any dispute not specifically covered by the Agreement. Notwithstanding this final provision, in an earlier clause, the Agreement unequivocally provided that "[n]o oral promises or explanations arising from the website, brochure, cover letter, e-mail, personal or otherwise, shall alter the written terms of this Agreement. The literature and/or conversations are for explanatory purposes only and to provide an overall guide as to the intentions of the syndicate."[3] Therefore, while Hutt retained much of the authority in managing RBG, his authority was not without limitation.

The Agreement also set forth the financial responsibilities and expectations of the investors, and the manner in which Hutt was to distribute any funds due to investors. The Agreement provided that investors holding an interest in RBG were responsible for paying expenses incurred in purchasing, training, and caring for the thoroughbred filly.[4] However,

---

[2] Plaintiff's Exhibit 1 at paragraphs 11, 12, 13, 14.

[3] Plaintiff's Exhibit 1 at paragraph 3.

[4] The Agreement specifically provides: "Each member/partner owning one full share is responsible for the life of this agreement for 3.33% of the total expenses. Members/Partner(s) owning a half share are

3

the Agreement also provided that excess capital not used in acquiring RBG, which amounted to $90,000.00, would be used to offset any training expenses.[5]  Moreover, the Agreement provided that "accumulated net purse earnings in excess of $9,000 . . . shall be distributed to the Member/Partner(s)," allocating the remaining $9,000 to be held in reserve to cover training expenses for the quarter.[6]  Net purse earnings are defined as earned purses less the customary fees and expenses incurred by entering RBG in a race.[7]  The Agreement further provided that Hutt would receive 10% of all purse earnings.   Finally, the Agreement provided that members holding an interest in the racehorse "shall maintain a pro-rata percentage of ownership" in the event that RBG was sold to an "outside" interest. [8]

### B.  Fantasy Lane's Sale to Adena Springs

As many individuals approached Hutt and recognized RBG's successful racing career, Hutt began to consider RBG's prospects as a broodmare.

In February 2011, Hutt and Frank Stronach ("Stronach") from Adena Springs Farm, an esteemed breeding farm, entered into a contract whereby Stronach would receive a 50% interest in RBG in exchange for $150,000 ("the Adena Springs contract").[9]  This sale had the net effect of diluting the current investors' interest in RBG by 50%.

---

responsible for 1.67%.  Member/Partner(s) owning a quarter-share are responsible for 0.835%.  These expenses are to be paid in advance on a quarterly (3 months) basis." Plaintiff's Exhibit 1 at paragraph 7.

[5] According to the record, the capital was in surplus

[6] Plaintiff's Exhibit 1 at paragraph 20.

[7] Plaintiff's Exhibit 1 at paragraph 20.

[8] Plaintiff's Exhibit 1 at paragraph 21.

[9] Plaintiff's Exhibit 7; Defendant's Exhibit E.

The Adena Springs contract also provided that Stronach and Fantasy Lanes were to share RBG's training expenses and net earnings. While the Adena Springs contract stated that Hutt would continue to manage RBG exclusively during her racing career, it also afforded Stronach the right to decide whether to retire RBG and begin her career as a broodmare.

On February 2, 2011, Hutt emailed the original investors and informed them of this new enterprise with Adena Springs and Stanoch.[10]

## PARTIES' CONTENTIONS

### A. Roman's Position

During Roman's case-in-chief, Roman was the sole witness to testify. Roman testified that he is employed by ASI Federal as a senior manager, consulting with the federal government on contract terms and conditions. Roman also testified to the following: Roman decided to invest in Fantasy Lane after receiving information about RBG from advertisements. He signed the Agreement on May 13, 2008, and at the time, owned three shares. Roman stated that under the Agreement, Defendants were to hold $9,000.00 of RGB's net purse earnings in reserve, and that anything in excess was to be distributed among the partners. In 2008, Roman received a distribution in the amount of $8,073.00 from RGB's first three races; however he did not receive any other distributions despite the fact that RBG earned a total of $436,117.00 purses during her racing career. Roman inquired as to when Hutt was going to make distribution payments on multiple occasions, but to no avail.

---

[10] Defendant's Exhibit F.

In early January 2009, Roman inquired, via e-mail, as to when Hutt was going to distribute purse earnings from RGB's last race. In response, Hutt stated that instead of asking for cash-calls, Defendants were keeping purse earnings in reserve to pay for future EBG expenses.[11] Roman indicated that by withholding the net purse earnings in excess of $9,000.00, Defendants were changing the terms and conditions of the Agreement. In response, Hutt explained that Defendants were trying to "balance everything," however Hutt also stated, "I don't say you are wrong because you are not." Roman argues that under Provision 3 of the Agreement, Defendants were prohibited from amending the Agreement to retain more than $9,000.00 in reserve.

In October 2009, on two separate occasions, after Roman inquired about distribution payments, Hutt indicated that a distribution payment was forthcoming in January 2010.[12] Hutt, however, did not make any distribution payments in January 2010.

On December 16, 2010, during a telephone conversation, Hutt expressed to Roman that he was concerned about other investors honoring future cash-calls, and indicated that Defendants would not be making any distributions at that time, despite the fact that the net purse earnings exceeded the $9,000.00 threshold. Hutt reiterated this concern in an email to Roman in April 2012.

Roman reiterated this testimony in his post-trial briefing. Additionally, with regard to the Adena Springs contract, Roman argued that a portion of net purse earnings that should have been distributed to the partners was actually distributed to Stronach, and that Roman received no compensation for his shares' decrease in value.

---

[11] Plaintiff's Exhibit 10 at p. 2.
[12] *See* Plaintiff's Exhibits 11, 12 at p. 1.

Roman argues that he is entitled to receive $18,140.88 for Defendants' breach of the Agreement. Additionally, he claims he is entitled to a disbursement of $6,907.00 from Defendants, and $16,483.50 based upon his 9% interest in the $150,000.00 which Fantasy Lane received from the sale in the Adena Springs contract. Roman also argues that he is entitled to attorney fees based on Defendants' bad faith conduct prior to and during this litigation.

## B. Defendants' Position

During the Defendants' case-in-chief, Hutt was the sole witness to testify. Hutt testified that he had been participating in the racing industry since 1985, and that he started Fantasy Lanes in 1999. Hutt also testified to the following: Hutt stated that he is the general manager for approximately twenty different partnerships involving thoroughbred horses. He indicated that due to the economic recession and operating expenses, the amount kept in reserve had to be increased. Specifically, Hutt testified that he told Roman that the Agreement (and others like it) changed from withholding $9,000.00 in reserves to $18,000.00. Hutt also testified that although the Agreement provides numerical figures detailing the cost of expenses and the amount partners were responsible for, those prices have "long since changed," and that those figures are not consistent with the pricing today.[13]

During his testimony, Hutt also stated that he retained more than the allowed $9,000.00 in order to cover potential future expenses and avoid asking Roman and other investors for any cash calls. Hutt alleged that "Provision 27 of the Agreement" gives him the authority to make amendments to the Agreement to reflect an increase in the amount of

---

[13] Hutt's testimony at trial

7

net purse earnings retained to pay for expenses. In relying on this provision, Defendants argue that Hutt, as the General Manager, was contractually permitted to amend the Agreement and preserve $18,000.00 every six months in net purse earnings to cover the cost of RBG's expenses since they increased as a result of the economy. Additionally, Hutt stated the importance of diminishing cash calls, because approximately 20% of cash calls go unpaid.

Hutt also testified that Roman's interest in RBG was diluted by half when Fantasy Lane entered into the Adena Springs contract. Hutt maintained that Roman could have objected to the Adena Springs contract in February 2011, when Hutt e-mailed all of the partners informing them of the contract, but Roman never objected.

Defendants restated Hutt's testimony in their post-trial brief. Defendants also argue that pursuant to Hutt's February 2, 2011 email, detailing the Adena Springs contract, "the partnership switched over to a broodmare partnership," and thus required additional, costly expenses.[14] Defendants argue that Roman is not entitled to recover on his claim because assuming *arguendo* that Roman is entitled to net purse earnings, the amount he would be entitled to would be $3,240.90, which ultimately would have been the amount that he was responsibility to pay in cash calls. Defendants also argue that attorneys fees are not warranted in this case because Defendants actions were not egregious.

## DISCUSSION

Addressing the three issues stated above, seriatim:

### A. Defendant's Breach of Contract

---

[14] Defendant's Post-Trial Brief, p. 3.

In order to prevail on a breach of contract claim, a Plaintiff must prove, by the preponderance of the evidence, that: (1) an agreement existed between Plaintiff and Defendants; (2) Defendants breached an obligation imposed by the contract; and (3) as a result of that breach, Plaintiff suffered damages.[15] It is undisputed that an agreement existed between the parties however, the parties dispute whether Defendant failed to fulfill its obligations under the contract.

The Court's ultimate goal in interpreting a contract is "to determine the parties' shared intent."[16] Delaware adheres to the objective theory of contract interpretation, so the Court will interpret the contract "as would an objectively reasonable third-party observer."[17] The Court will "read [the] contract as a whole and . . . give each provision and term effect, so as to not render any part of the contract mere surplusage."[18] In considering the contract, "specific language . . . will prevail over general language where the two conflict."[19]

Under the Agreement, upon purchasing an interest in RGB, Roman had a contractual obligation to pay for certain expenses incurred in caring for and racing RBG, while Hutt had a contractual obligation to manage the daily operations of caring for and racing RBG, including distributing net purse earnings to the investors. The plain meaning of the Agreement clearly sets forth the manner in which Hutt, on behalf of Fantasy Lanes, would distribute net purse earnings to Roman and other investors. Specifically, Provision 20 of the Agreement states, in pertinent part:

---

[15] *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003);

[16] *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

[17] *Sassano*, 948 A.2d at 462 (citations omitted).

[18] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010).

[19] *Global Energy Finance LLC v. Peabody Energy Corp.*, 2011 WL 4056164 at *22, (Del. Super. 2010).

9

> Periodically, anticipated quarterly, accumulated net purse earnings in excess of $9,000 per horse (3 months training expenses) to be kept in reserve shall be distributed to the Member/Partner(s). Net purse earnings are earned purses less the customary fees to the trainer (10/11%), jockey (10%), groom (1%) and win photographs. If the horse[ is] fortunate to be of stakes caliber, then nomination, entry [and] starting fees will be deducted from purse earnings as well.

Thus, under the Agreement, Hutt, as the General Manager, had a contractual obligation to distribute net purse earnings that were in excess of $9,000.00. Aside from the distribution Hutt made to Roman in October 2008, Hutt failed to distribute any other net purse earnings to Roman in 2009, 2010, and 2011, as proscribed by the Agreement.

Although Defendants argue that Hutt had authority under Provision 27 to withhold more than $9,000.00 in reserves in order to secure money for future expenses, his authority is limited by Provision 3 of the Agreement. Provision 27 of the Agreement states, in pertinent part, "[a]lthough every attempt has been made to cover all contingencies, should a situation occur not covered by this Agreement, the General Manager maintains the sole exclusive authority to adjudicate any disputes in a customary and reasonable manner." However, under Provision 3, "[n]o oral promises or explanations arising from the website, brochure, cover letter, e-mail, personal or otherwise, shall alter the written terms of this Agreement." Thus, Provision 3 is unequivocally clear in stating that the Agreement cannot be amended through email.

Furthermore, in construing the Agreement as a whole, the Court finds that the specific language in both Provision 20 and 3 controls over the general language set forth in Provision 27. Provision 20 clearly outlines the manner in which Hutt must make disbursements to partners, and although it does not account for inflation or preserving extra

funds to pay for expenses, Provision 3 clearly indicates the way in which the Agreement cannot be amended. As such, e-mails and other conversations, either formal or informal, are insufficient to make any alteration to the Agreement. Therefore, the only logical reading of the contract leads me to conclude that Defendants breached the contract by failing to make distributions to Roman when the net purse earnings were in excess of $9,000.00 in 2009, 2010, and 2011.

Additionally, the Agreement also provided that upon the sale (or partial sale) of RBG, Defendants had a contractual obligation to ensure that Roman maintained his pro-rata percentage of ownership in RBG. Specifically, Provision 21 provides: "[s]hould the [horse] be syndicated after [her] racing career is over, or a portion sold for racing purposes, the Member/Partner(s) shall maintain his/her pro-rata percentage of ownership should the [horse] be sold to outside Interests." When Defendants sold 50% interest to Stronach under the Adena Springs Contract, Roman's ownership was reduced by 50%, leaving him with a 4.5% interest in RBG. Therefore, Roman is entitled to compensation for the dilution of his interest in RBG with regard to the Adena Springs contract.

In sum, the record reflects, and Roman has proved by a preponderance of the evidence, that Defendants breached the Agreement by failing to distribute Roman's share of net purse earnings as required by the Agreement, and by failing to compensate Roman for diluting his shares upon entering the Adena Springs contract. Although Defendants argue that Roman has not suffered damages because the amount he is entitled to is off-set by the amount that he is responsible for in paying RBG's expenses, the Court finds that Roman is entitled to some relief, as set forth below.

11

**B. Damages Recoverable by Plaintiff**

The standard remedy for breach of contract is based upon the reasonable expectations of the parties to the contract.[20] Expectation damages are measured by determining "the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[21] Here, that amount would be a combination of distribution payments owed to Roman and the value of Roman's 9% interest in RBG at the time Fantasy Lane entered into the Adena Springs contract.

There is a serious conflict as to the way in which the parties have calculated damages. Therefore, the Court will calculate damages by referring to the numbers provided in Plaintiff's Exhibit 5, which were supplied by Defendants in an email.[22] In this case, Defendants breached the Agreement in 2009, 2010, and 2011 when Hutt failed to make any distributions to Roman. While Provision 20 provides that these distributions were "anticipated quarterly," the record is void of any clear evidence or testimony specifically outlining the breakdown of expenses, purse earnings, and other payments per quarter. Therefore, the Court will calculate the damages by looking at each year.

Under the Agreement, after RBG earned purses for placing in a race, payments and distributions were to be made in a particular order. First, pursuant to Provision 15 of the Agreement, Hutt was to receive 10% of all purse earnings as management compensation. Then, as provided by Provision 20, fees to the trainer and jockey, as well as fees for

---

[20] Duncan v. Thera Tx, Inc., 775 A.2d 1019, 1022 (Del. 2001).

[21] *Id.*

[22] In reviewing the evidence presented at trial, the Court relied on Plaintiff's Exhibits 6 and 19 to determine RBG'S operating finances. Defendant stipulated to these numbers, and both parties referred to and relied on this evidence at trial

grooming and photographs (collectively "race expenses"), were to be paid with the amount of purse earnings remaining. Once these race expenses were accounted for, if the net purse earnings were in excess of $9,000.00, Hutt was to distribute funds to Roman in accordance with his share.

In 2009, the gross purse earnings totaled to $24,922.50. During this year, Hutt disbursed $2,181.25 to himself, representing his compensation for managing RBG. Race expenses incurred totaled $4,026.69, leaving $18,714.56 in net purse earnings.[23] Roman's share of the earnings under the Agreement is $1,263.23. For 2009, Roman would have been expected to contribute $1,504.95 for all other expenses, as provided by Provision 7 of the Agreement.[24] Therefore, had Defendants distributed the purse earnings, Roman still would have owed Defendants $241.72 in order to fulfill his obligation in paying for expenses.

In 2010, the gross purse earnings totaled to $151,221.73. Hutt disbursed $13,321.63 to himself as compensation for managing RBG. Race expenses totaled to $47,806.00, leaving $90,094.15 in net purse earnings. Other expenses incurred totaled to $36,157.49, however to cover some of those expenses, Defendants made a cash-call to the partners, and the partners contributed a combined total of $18,000.00. After the cash-call, the remaining balance of expenses totaled to $18,157.49. For 2010, Roman's share of the earnings totaled to $8,108.47, and he would have been expected to contribute $1,813.93 for all other

---

[23] This does not include training expenses, which totaled to $34,066.00, as the record reflects that capital overflow accounted for training.

[24] At the time, Roman had 2 ¼ shares, which meant that he was responsible for 7.495% of all other expenses, which totaled to $20,079.15.

13

expenses.[25]   Therefore, had Defendants not breached the Agreement and distributed the funds owed to Roman, he would have received $6,294.54.

In 2011, RBG ended her racing career by earning $88,661.46 in purse earnings.[26] Hutt dispersed $5,986.35 to himself, representing his compensation for managing RBG. Racing expenses incurred totaled to $19,104.00, leaving $63,571.11 in net purse earnings. Stronach received half of the net purse earnings, as provided by the Adena Springs Contract, so the amount to be distributed to the partners totaled to $31,785.56.  Thus, Roman's pro-rata share of the earnings would have been $2,860.70, and he would have been expected to contribute $1,768.33 for all other expenses.[27] Therefore, had Defendants distributed the purse earnings, Roman would have received $1,092.37.

Additionally, with respect to the sale to Stronach in the Adena Springs Contract, Roman is entitled to receive compensation for the dilution of his shares. Under Provision 21 of the Agreement, members holding an interest in the racehorse "shall maintain a pro-rata percentage of ownership" in the event that RBG was sold to an "outside" interest. [28]  Under the Adena Springs contract, Stronach paid $150,000 in exchange for 50% interest in RBG. In order for him to receive 50% interest, Defendants diluted the partners' shares by 50%. Essentially, this was a sale of Roman's assets since he had an interest in RBG.  Therefore,

---

[25] At the time, Roman had 3 shares, which meant that he was responsible for 9.99% of all other expenses.

[26] Plaintiffs Exhibit 6 at p. 6.

[27] At the time, Roman had 3 shares, which meant that he was responsible for 9.99% of all other expenses, which totaled to $17,701.

[28] Plaintiff's Exhibit 1 at paragraph 21.

14

Roman is entitled to compensation in the amount of $6,750.00, which represents 4.5% of Roman's interest that Stronach acquired.

## C. Attorney's Fees

Delaware follows the American Rule, which provides that each party bears the cost of its own legal fees.[29] Although fee shifting is seldom ordered in Delaware, the Court may grant attorney's fees if it finds, under the totality of the circumstances, "that a party brought litigation in bad faith or acted in bad faith during the course of litigation."[30] The bad faith exception to the American Rule only applies "in extraordinary circumstances as a tool to deter abusive litigation and to protect the integrity of the judicial process."[31] A party must have acted "vexatiously, wantonly, or for oppressive reasons" in order for the Court to award attorney's fees.[32]

Roman argues that he is entitled to an award of attorney's fees based upon Defendants' bad faith conduct both prior to and during litigation. Specifically, Roman argues, *inter alia*, that attorney's fees should be awarded because Defendants failed to comply with the Courts' March 22, 2013 Order to fully and completely respond to discovery in ten days; failed to pay ordered counsel fees until the morning of trial when such fees were due seventeen months prior; produced discoverable documents a few days before trial, and; engaged in "disruptive and disrespectful conduct during trial, [which] result[ed] in Mr. Hutt

---

[29] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010).

[30] *Merrill Lynch Trust Co., FSB v. Campbell*, 2009 WL 2913893 at *15 (Del. Ch. Sept. 2, 2009).

[31] *P.J. Bale, Inc. v. Rapuano,* 2005 WL 3091885, at *1 (Del. 2005).

[32] *Kaung v. Cole Nat'l Corp.,* 884 A.2d 500, 506 (Del. 2005).

being held in contempt of court."[33]  On the other hand, Defendants argue that attorney's fees should not be awarded because Defendants' conduct does not rise to the level of being vexatious, wanton, or frivolous.  Defendants contend that the Court already sanctioned Defendants by not complying with a discovery request, and that Defendants' counsel's failure to provide some of the requested documents was not vexatious, wanton, or frivolous, but rather, "simply a mistake by an over-stressed attorney."[34]

The Court finds that awarding attorney's fees is inappropriate in this matter. Although Defendants' conduct during litigation was disrespectful to the Court and the judicial process, such conduct has already been addressed.  The Court sanctioned Defendants for their failure to timely produce discoverable documents, and the Court also held Hutt in contempt for his behavior during trial.  Additionally, while Defendants' behavior prior to trial was inexcusable, the Court finds that it does not rise to the level of vexatious, wanton or frivolous behavior.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiff in the amount of $13,895.19 for breach of contract.

**IT IS SO ORDERED.**

_____
The Honorable Alex J. Smalls.
Chief Judge

---

[33] Plaintiff's Reply Brief, at p. 3

[34] Defendant's Reply Brief, at p. 5