# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, et al. | ) ) ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. 2022-0289-SG |
| TENET BUSINESS SERVICES CORPORATION, et al., | ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  May 9, 2023
Date Decided:  August 18, 2023

Michael A. Barlow and Adam K. Schulman, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Anthony Bongiorno and Jessica Reese, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, Boston, Massachusetts; Rollo C. Baker IV and Eric White, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for Plaintiffs and Counterclaim Defendants Steward Health Care System LLC, Steward Medical Group, Inc., Steward PGH, Inc., Steward NSMC, Inc., Steward CGH, Inc., and Steward HH, Inc.*

Lewis H. Lazarus, K. Tyler O'Connell, Albert J. Carroll, and Barnaby Grzaslewicz of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Timothy W. Knapp, Brendan E. Ryan, and Kent J. Hayden, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Counsel for Defendants and Counterclaim Plaintiffs Tenet Business Services Corporation and Tenet Healthcare Corporation*.

**GLASSCOCK, Vice Chancellor**

This matter is before me on the parties' cross motions for partial summary judgment. The motions entail resolution of a dispute over discrete contractual language in an asset purchase agreement. That agreement writ large is the subject of this litigation, of which what follows is but a part. The assets sold include Florida hospitals. The discrete language in question involves allocation, between buyers and sellers, of benefits paid by the state of Florida to the hospitals. The language is difficult, in part because the drafting is not ideal. In larger part, it is difficult because understanding it requires reference to a governmental program, the Florida Direct Payment Program (the "DPP"). The DPP is not only referenced in the contract but is the explicit subject of the language in question, through which the parties agreed to apportion the payments, referred to as "distributions". As I described it in intentionally simplified form in an earlier opinion in this matter addressing a request for preliminary injunction:

> Under the DPP, Florida established "special assessments" that it charges to participating hospitals. Florida's Agency for Health Care Administration . . . then places the revenue generated from those assessments into a fund, which is matched by federal funds. The combined total is then sent to "Managed Care Organizations," who in turn distribute the funds to participating hospitals "as supplemental Medicaid reimbursements" ("DPP Distributions"). Those DPP

1

Distributions are "directly link[ed] . . . to utilization of inpatient and outpatient services" and "occur retroactively."[1]

Once the scheme for repayment under the program is understood and the contract is read as whole, the language is not ambiguous and the parties' intent is readily resolved, in favor of the Defendant/Counterclaim Plaintiffs, the sellers in the transaction. The parties have submitted extrinsic evidence on which I do not rely but find supportive of my understanding of the contract language. My rationale is set out below.

## I. BACKGROUND

### A. Factual Background

I discussed the facts giving rise to this action in my prior Memorandum Opinion dated August 1, 2022,[2] and I limit myself here to only those facts necessary to understand this opinion. The Plaintiffs are the buyers and the Defendants the sellers in the transaction at issue. The parties to this action (the "Buyers" and the "Sellers", collectively the "Parties") executed an Asset Purchase Agreement (the "APA") on June 16, 2021, to facilitate the sale of a group of hospitals in Florida.[3] Though this dispute spans contracts beyond the APA itself and includes multiple

---

[1] *Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, 2022 WL 3025587, at *3 (Del. Ch. Aug. 1, 2022) ("*Steward I*") (citations omitted).
[2] *See id.*
[3] *Id.* at *2.

provisions within that document,[4] this opinion focuses on issues relating to APA Section 8.22, which details the distribution of DPP payments.[5] The Parties also moved for summary judgment with respect to responsibility for repayments under another governmental program, the Accelerated and Advanced Payment Program. I leave those issues, which are fact-intensive, for trial.

### 1. The DPP

The DPP is a Florida state-sponsored, federally-approved program designed to address uncompensated Medicaid costs borne by Florida's hospitals.[6] Under the DPP, Florida established "special assessments" that it charges participating hospitals.[7] Florida's Agency for Health Care Administration ("AHCA") places the assessments into a fund, and federal funds match those assessments.[8] "Managed Care Organizations" then distribute the matched funds to participating hospitals "as supplemental Medicaid reimbursements" ("DPP Distributions").[9] Those DPP Distributions are "directly link[ed] . . . to utilization of inpatient and outpatient services" and "occur retroactively," in the sense that reimbursements, when paid,

---

[4] *See id.* at *4.
[5] Verified Compl. Ex. 1, Dkt. No. 1 ("APA").
[6] Answer and Countercls. to the Verified Compl. ¶ 57, Dkt. No. 24 ("Defs.' Answer and Countercls."); Answer to the Verified Countercls. ¶ 48, Dkt. No. 34 ("Pls.' Answer").
[7] Defs.' Answer and Countercls. ¶ 57; Pls.' Answer ¶¶ 50–51.
[8] *Id.*
[9] Defs.' Answer and Countercls. ¶ 57; Pls.' Answer ¶ 51.

would be for a then-historical period during which assessment fees had been incurred and services performed.[10]

To institute the DPP, on November 16, 2020, AHCA submitted an application to the federal Centers for Medicare and Medicaid Services ("CMS") for a "rating period" covering "October 1, 2020 through September 30, 2021."[11]  On April 26, 2021, CMS approved a revised version of the application for the October 1, 2020 to September 30, 2021 rating period.[12]

The Buyers and Sellers dispute how DPP Distributions should be allocated under the terms of the APA.  As explained in detail below, the APA includes

---

[10] Transmittal Aff. Barnaby Grzaslewicz, Esq. Supp. Defs.' Answering Br. Opp'n Pls.' Mot. Summ. J. and Br. Supp. Defs.' Cross-Mot. Summ. J. Ex. 4 at 5, Dkt. No. 44 ("CMS Approval Letter").  This comports with Buyers' counsel's knowledge of the DPP.
"THE COURT: Can we revisit something you said earlier?  I just want to make sure I understand your position. Your position is that at the time of contracting, the parties didn't know that the DPP program would both assess and distribute benefits retroactively.  That is, they didn't know that they were going to be assessed and paid a year after the year in which they were incurred. ATTORNEY BAKER: If I said that, I did not intend to say that. . . .
ATTORNEY BAKER: So I thought the question was, at the time the DPP was signed, was there certainty as to the time period in which assessments would be collected and payments made.  And the answer to that was no, and that at the time the APA was signed, the different types of distributions were a possibility.  I believe that at the time of signing, the parties did understand that the amount of payments that hospitals would be receiving would be based on a historical rating period.
THE COURT: Okay.  So they knew at the time of signing that it would be post-September 30, 2021, when assessments and benefits would be paid for the 2021 year.
ATTORNEY BAKER: For the 2021 year?
THE COURT: For the year from October 1, 2020 through September 30, 2021, both assessments and benefits would be incurred and paid after September 30th.  They knew that.
ATTORNEY BAKER: Correct. But they didn't know when closing would occur." Tr. 7.12.2022 Oral Arg. 28:4–29:13, Dkt. No. 82.
[11] CMS Approval Letter at 1.
[12] *See id.*

4

provisions governing the allocation of DPP Distributions based on contractually defined "Program Year" periods in relation to when "Closing" occurs.[13] The Buyers argue that they are entitled to the entirety of the DPP Distributions based on the 2020-21 rating period. In contrast, the Sellers contend that, after certain deductions, they are entitled to approximately 10/12ths of the DPP Distributions for the period in question, and Buyers should receive only 2/12ths of the DPP Distributions.

2. The APA's DPP Provision

APA Section 8.22 (the "DPP Provision") governs the division of DPP Payments, with allocation governed by "Program Year."[14] Program Year is defined as "the program year (i.e., October 1 through September 30) in which assessments are collected and payments are made with respect to the Healthcare Business in connection with the Florida Directed Payment Program."[15]

For the "Program Year in which Closing occurs"—the "straddle" year in which ownership transitioned from Sellers to Buyers—Buyers are reimbursed for assessments they paid and the "DPP Payment Amount."[16] The remainder of these

---

[13] *See* APA § 8.22.
[14] *Id.*
[15] *Id.*
[16] *Id.*

5

"DPP Straddle Distributions" is divided between the Sellers and the Buyers on a

prorated per diem basis.

> With respect to any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to the Program Year in which the Closing occurs (the "DPP Straddle Distributions"), Buyers shall first receive from the DPP Straddle Distributions an amount equal to the total assessments paid by Buyers or their Affiliates with respect to the Healthcare Business in connection with the Florida Directed Payment Program plus the DPP Payment Amount, and, to the extent there is any remaining portion of the DPP Straddle Distributions after such payment to Buyers, then the Parties shall prorate such remaining amount of the DPP Straddle Distribution on a per diem basis with (i) Sellers receiving a portion of such remaining DPP Straddle Distributions based on a fraction, the numerator of which is the number of calendar days in such Program Year that are prior to and include the Closing Date and the denominator of which is 365 and (ii) Buyers receiving a portion of such remaining DPP Straddle Distributions based on a fraction, the numerator of which is the number of calendar days in such Program Year that follow the Closing Date and the denominator of which is 365.[17]

Buyers are entitled to 100% of the DPP Distributions for Program Years after

the straddle year.

> Buyers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to any Program Year after the Program Year in which the Closing occurs (the "Post-Closing DPP Distributions").[18]

---

[17] *Id.*
[18] *Id.*

Sellers, on the other hand, are entitled to the DPP Distributions in Program Years prior to the Program Year in which the Closing occurs.

> Sellers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to any Program Year prior to the Program Year in which the Closing occurs (the "Pre-Closing DPP Distributions" . . .).[19]

Closing occurred on August 1, 2021.[20] The Program Year associated with the Closing thus ended on September 30, 2021. Assessments and payments under the DPP began in October 2021, after the Program Year in which Closing occurred, relating to services performed in the 2020-21 Program Year.[21]

### 3. The Negotiations

Ralph de la Torre, Steward's Chairman and CEO, led the negotiations on behalf of Buyers.[22] Saum Sutaria, Tenet's CEO, led negotiations on behalf of Sellers.[23] Over the course of negotiations, both Buyers and Sellers were represented by counsel.[24]

---

[19] *Id.*
[20] Defs.' Answer and Countercls. ¶ 60; Pls.' Answer ¶ 134.
[21] *See* Pls.' Br. Further Supp. Their Mot. Summ. J. 20, Dkt. No. 53; Defs.' Answering Br. Opp'n Pls.' Mot. Summ. J. and Br. Supp. Defs.' Cross-Mot. Summ. J. 44, Dkt. No. 43 ("Defs.' Answering Br.").
[22] Transmittal Aff. Adam K. Schulman, Esq. Supp. Pls.' Suppl. Br. Supp. Their Mot. Summ. J. ("Schulman Aff.") Ex. 2 at 8:14–16, Dkt. No. 158 ("de la Torre Dep.").
[23] de la Torre Dep. 51:19–52:6.
[24] Schulman Aff. Ex. 3 at 75:9–17, 84:22–3, Dkt. No. 158 ("Wales Dep."); Schulman Aff. Ex. 4 at 29:7–10, Dkt. No. 158, ("Maloney Dep.").

At the start of negotiations, the DPP was a possibility rather than a probability.[25] The program was awaiting approvals from CMS, the Florida state legislature, and Miami-Dade County.[26]

Sellers sought to include estimates of the potential DPP Distributions in their valuation and included an annual receivable of $29.1 million in projected DPP Distributions.[27] However, given the risk of the DPP not coming to fruition, the Parties agreed to discount the DPP Distributions by the likelihood of non-passage.[28]

In January 2021, the Parties executed a letter of intent for the sale of the hospitals with a $1 billion price tag.[29] That price included the agreed upon value of the DPP.[30]

On January 28, 2021, in accordance with the letter of intent, the Sellers-drafted first draft of the APA included a $1 billion purchase price and an adjustment in the event that the DPP failed to be enacted.[31]

The Sellers proposed the first pro-rating provision on March 18, 2021.[32] The provision called for *pro rata* division of DPP Distributions "received by Buyers . . .

---

[25] Wales Dep. 135:5–20.
[26] Schulman Aff. Ex. 5 at STE_DE_0002872, Dkt. No. 158.
[27] *Id.* at -2872.
[28] de la Torre Dep. 158:16–22; Schulman Aff. Ex. 11 at STE_DE_0023402-3404, Dkt. No. 159.
[29] Schulman Aff. Ex. 7 at STE_DE_0024535, Dkt. No. 158.
[30] *Id.* at -4535 n.5 ("In the event the legislation regarding the Directed Payment Program impacting the Hospitals is not enacted by the closing, then the parties will discuss an appropriate adjustment to the Purchase Price.").
[31] Schulman Aff. Ex. 8 at ALSTON00008331, -8343 n.3, Dkt. No. 158.
[32] *See* Schulman Aff. Ex. 9 at ALSTON00007253, Dkt. No. 158.

following the Closing Date . . . that relate to any measurement period under the DPP Program that ends on or prior to the Closing Date."[33]  The Parties discussed the value of the DPP and on April 19, 2021, Sellers sent a revised draft of the APA decreasing the purchase price, removing the *pro rata* provision, and adding a provision for an upwards price adjustment for DPP assessments paid by Sellers prior to Closing.[34] The Buyers agreed with these changes and added that they were entitled to "all reimbursements and distributions . . . received in connection with the Florida Directed Payment Program, whether such reimbursements or distributions relate to measurement periods before or after the Closing Date."[35]  Subsequent drafts maintained the zero sum DPP Provision but allowed Sellers reimbursement for DPP assessments paid to CMS.[36]

By June 2021, DPP passage looked likely.  Notably, in late April 2021, the DPP received state approval,[37] and on May 6, 2021, it received CMS approval for

[33] *Id.* at -7339.

[34] Schulman Aff. Ex. 14 at Tenet00000910, -0917, -0978, Dkt. No. 159.

[35] Schulman Aff. Ex. 15 at Tenet00009987, -9992, Dkt. No. 159; Pls.' Suppl. Br. in Supp. of Their Mot. for Summ. J. 9, Dkt. No. 157 ("Pls.' Suppl. Br.").

[36] Schulman Aff. Ex. 16 at Tenet00001381, -1383, -1388, Dkt. No. 159; *see* Schulman Aff. Ex. 17 at ALSTON00006002, -6004, -6009, Dkt. No. 159; Schulman Aff. Ex. 18 at STE_DE_0002485, -2487, -2492, Dkt. No. 160; Schulman Aff. Ex. 19 at STE_DE_0027538, -7540, -7545, Dkt. No. 160.

[37] Schulman Aff. Ex. 20 Dkt. No. 160.

the measurement period October 1, 2020 through September 30, 2021.[38] The final puzzle piece was local approval and implementation.[39]

Certainty, or at least near certainty, has value, and on May 8, 2021, Sellers "blew up the deal" and stated that they were no longer interested in pursuing the transaction.[40] Internally, Sellers had discussed abandoning the transaction in light of the DPP's approvals.[41]

Negotiations began anew in June.[42] Sellers sought an increased purchase price.[43] Specifically, Sellers sought an increased price of between $1.07 and $1.15 billion.[44] In addition, Sellers proposed that they should receive a *pro rata* portion of the DPP Distribution but did so *outside* of the purchase price.[45] As such, they expected their DPP Distribution share would be $31 million. In connection with their renewed proposal, Sellers noted,

---

[38] Schulman Aff. Ex. 21 Dkt. No. 160; Schulman Aff. Ex. 22 Dkt. No. 160.

[39] Schulman Aff. Ex. 20.

[40] Schulman Aff. Ex. 24 ("Tenet has gone pencils down on the deal. They are reconsidering price now that the DPP is likely passing and the business is performing well."), Dkt. No. 160; Schulman Aff. Ex. 6 at 55:4–15, Dkt. No. 158.

[41] Schulman Aff. Ex. 23 ("Don't flip (though your new center of gravity probably helps prevent that) but I may blow up Miami deal. DPP fully approved. No Medicaid cuts. Your BD successful so far. And they are demanding 137M in working capital (we are off by 75M with our estimates closer to 65M) which means effective multiple on the deal is 7. Just the working capital difference pays the capital."), Dkt. No. 160.

[42] Schulman Aff. Ex. 25 at Tenet00010771, Dkt. No. 160; Maloney Dep. 201:12–16.

[43] Schulman Aff. Ex. 26 at STE_DE_0021283 ("Considering the elimination of DPP risk and the substantially increased performance at the hospitals, the Miami hospitals have increased in valuation"), Dkt. No. 160.

[44] *Id.* at -1285.

[45] *Id.*

• In April, DPP funding was approved by the Florida legislature and contemplated Florida Medicaid cuts were not approved by the state legislature

• In addition to these positive developments, the Florida Market continues to outperform performance targets due to improved acuity and payor mix

• Through May, the Miami hospitals are 27% ahead of plan. As a result, we now expect the market to achieve $115 - $125mm in pre-DPP EBITDA ($120mm equates to performing at plan for the final 7 months). [. . . .]

• Given the likely timing of the transaction and Tenet's lobbying efforts to secure the passage of DPP legislation we have also included the impact of Tenet retaining its pro-rata share of the 2021 DPP payment[46]

Accordingly, Sellers followed up with an APA draft dated June 11, 2021, that increased the purchase price to $1.1 billion.[47] The purchase price, however, was exclusive of the new DPP Provision which allocated distributions "relating to measurement periods before the Closing Date" on a *pro rata* basis.[48]

> 8.22 **DPP Distributions.** With respect to any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to measurement periods before the Closing Date (the "DPP Distributions"), the Parties shall prorate such amounts on a per diem basis with (i) Sellers receiving a portion of the DPP Distributions based on a fraction, the numerator of which is the number of calendar days in the calendar year in which the Closing occurs that are prior to and include the Closing Date and the denominator of which is 365 and (ii) Buyers receiving a portion of the DPP Distributions based on a fraction, the numerator of which is the number of calendar days in the calendar year in which the Closing

---

[46] *Id.*

[47] Second Suppl. Transmittal Aff. Barnaby Grzaslewicz, Esq. ("Second Suppl. Grzaslewicz Aff.") Ex. 13 at Tenet00004179, -4195, Dkt. No. 165; Schulman Aff. Ex. 27 at ALSTON00001352, -1368, Dkt. No. 160.

[48] Second Suppl. Grzaslewicz Aff. Ex. 13 at Tenet00004195; Schulman Aff. Ex. 27 at ALSTON00001368, -1438.

11

occurs that follow the Closing Date and the denominator of which is 365.[49]

On June 14, the Parties met at Sellers' headquarters in Dallas, Texas.[50] Buyers state that they agreed to increase the purchase price.[51] Post-close DPP Distributions were also discussed.[52] In deposition, when asked about the DPP discussions at the June 14 meeting, Buyers' deal counsel stated,

> I recall, generally speaking, that we were concerned with the language that [Sellers'] counsel Alston & Bird sent across in the June 12 revised APA. I recall that we had discomfort about the fact that it had words relating to a measurement period, and I was being concerned that that was very vague and swishy language. I also remember us being concerned that there was no discussion of we, [Buyers], were entitled to post-closing period amounts. I recall those two things being raised in the June 14 meeting. I don't recall the specifics of the conversation.[53]

An internal Sellers email sent on the day of the meeting stated that "[Buyers have] now agreed to pay us $1.10 billion at closing, and we will also receive

---

[49] The drafting history documents here follow the convention that deleted language (from the prior draft) is struck through and added language is underlined.

[50] Wales Dep. 165:11–16; Maloney Dep. 47:15–22.

[51] Pls.' Suppl. Br. 13.

[52] Buyers contend that "because they had already agreed to the additional $100 million, Buyers did not agree to guarantee Sellers a *pro rata* share of the Year 1 DPP distributions, as Sellers had demanded." Pls.' Suppl. Br. 13. The evidence cited includes testimony by Buyers' chief negotiator, de la Torre, and its deal counsel. In deposition, de la Torre stated "we didn't agree to [pro rate DPP distributions.]" de la Torre Dep. 61:4–10. Deal counsel, when asked about the June 14 meeting, stated that he was concerned with the "measurement period" language and the lack of discussion that "Steward, w[as] entitled to post-closing period amounts." Wales Dep. 176:14–177:7.

[53] Wales Dep. 176:19–177:7.

our pro-rata share of this year's supplemental revenue program, estimated to be $25-30 million."[54]

That evening, Buyers' counsel sent the following markup to Sellers:

> 8.22  **DPP Distributions.**  With respect to any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to ~~measurement periods before~~<u>the program hear (i.e., October 1 through September 30) in which</u> the Closing ~~Date~~<u>occurs</u> (the "***DPP Distributions***"), the Parties shall prorate such amounts on a per diem basis with (i) Seller receiving a portion of the DPP Distributions based on a fraction, the numerator of which is the number of calendar days in ~~the calendar~~<u>such program</u> year ~~in which the Closing occurs~~ that are prior to and include the Closing Date and the denominator is 365 and (ii) Buyers receiving a portion of the DPP Distributions based on a fraction, the numerator of which is the number of calendar days in the Calendar <u>such program</u> year ~~in which the Closing occurs~~ that follow the Closing Date and the denominator of which is 365.  <u>Buyers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of attributable to or received in connection with the Florida Directed Payment Program and relating to any program year after the year in which the Closing occurs.</u>

Buyers eliminated "measurement periods," replaced them with cleanly denominated "program years," and clarified that they were "entitled to 100% of any reimbursement or distribution . . . relating to any program year after the year in which the Closing occurs."[55]

---

[54] Second Suppl. Grzaslewicz Aff. Ex. 2, Dkt. No. 165.
[55] Schulman Aff. Ex. 28 at ALSTON00002211, Dkt. No. 160.

Sellers revised the draft and sent it back to the Buyers on June 15, 2021.[56] In the revised draft, Sellers had accepted Buyers' changes relating to DPP Distributions.[57] Sellers also laid the groundwork for the division of DPP Distributions into three periods by adding language guaranteeing Sellers 100% of any DPP Distributions made in a "program year prior to the program year in which the Closing occurs" and adding the defined terms "DPP Straddle Distributions," "Post-Closing DPP Distributions," and "Pre-Closing DPP Distributions."[58]

On June 15, 2021, the Parties' counsel spoke by phone "to walk through some of [Buyers'] changes . . . in an effort to finalize this agreement."[59] The proposed changes included: (i) clarifying the meaning of "program year," and (ii) making clear that if there were any DPP Straddle Distributions, Buyers would receive back any assessments they paid into the DPP before any DPP Straddle Distributions were divided *pro rata*.[60] The next day, by email, Buyers' counsel followed up to ask if Sellers' counsel had run the changes by their client.[61] Sellers' counsel replied in the negative but stated that the concept made sense on its face, and noted that Sellers' counsel would need to see the language before advising Sellers.[62]

---

[56] Schulman Aff. Ex. 29 at ALSTON00001713, -1804-1805, Dkt. No. 160.
[57] *See* Schulman Aff. Ex. 29.
[58] *Id.* at ALSTON00001804-1805.
[59] *See* Schulman Aff. Ex. 30 at 82:20–84:3, Dkt. No. 161; Schulman Aff. Ex. 31 at STE_DE_00031427, Dkt. No. 161.
[60] *See* Schulman Aff. Ex. 35 at ALSTON00002987, Dkt. No. 161.
[61] Schulman Aff. Ex. 36 at ALSTON00018419, Dkt. No. 161.
[62] *Id.*

Buyers followed up with proposed changes.[63]

8.22   **DPP Distributions**.   With respect to any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to the ~~program year (i.e., October through September 30)~~Program Year in which the Closing occurs (the "***DPP Straddle Distributions***"), Buyers shall first receive from the DPP Straddle Distributions an amount equal to the total assessments paid by Buyers or their Affiliates with respect to the Healthcare Business in connection with the Florida Directed Payment Program, and, to the extent there is any remaining portion of the DPP Straddle Distributions after such payment to Buyers, then the Parties shall prorate such ~~amounts~~remaining Amount of the DPP Straddle Distribution on a per diem basis with (i) Sellers receiving a portion of ~~the~~such remaining DPP Straddle Distributions based on a fraction, the numerator of which is the number of calendar days in such ~~program year~~Program Year that are prior to and include the Closing Date and the denominator of which is 365 and (ii) Buyers receiving a portion of ~~the~~such remaining DPP Straddle Distributions based on a fraction, the numerator of which is the number of calendar days in such ~~program year~~Program Year that follow the Closing Date and the denominator of which is 365.  Buyers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to any ~~program year~~Program Year prior to the ~~program year~~Program Year in which the Closing occurs (the "***Post-Closing DPP Distributions***"), and Sellers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to any ~~program year~~Program Year prior to the ~~program year~~Program Year in which the Closing occurs (the "***Pre-Closing DPP Distributions***" and collectively with the DPP Straddle Distributions and the Post-Closing DPP Distributions, the "***DPP Distributions***").  For purposes of this Section 8.22, "***Program Year***" means the program year (i.e., October 1 through September 30) in which assessments are collected and payments are made with respect

---

[63] Schulman Aff. Ex. 35 at ALSTON00002987.

to the Healthcare Business in connection with the Florida Directed Payment Program.

The changes included creating and defining the term "Program Year" as well as ensuring Buyers were remunerated for the total assessments they paid prior to *pro rata* distribution of the remainder of DPP Distributions.[64] Sellers discussed this penultimate draft among themselves[65] and later sent a revised draft that was substantively the same regarding the DPP to Buyers.

On June 16, 2021, the Parties executed the APA.[66] The transaction closed on August 1, 2021.[67]

*B. Procedural History*

This matter and the related matter concerning arbitration of APA Section 2.5[68] have been hard-fought. Buyers filed the initial complaint (the "Complaint") in this action as well as a motion to expedite on March 25, 2022.[69] The Complaint brought four causes of action, seeking a declaratory judgment affirming Buyers' interpretation of the APA and Sellers' alleged breaches of these agreements, specific performance of the APA and a Transition Services Agreement (the "TSA"), a

---

[64] *Id.*

[65] Schulman Aff. Ex. 37 at Tenet00007617–7619, Dkt. No. 161.

[66] *See* APA.

[67] Defs.' Answer and Countercls. ¶ 60; Pls.' Answer ¶ 134.

[68] *See Tenet Healthcare Corp. v. Steward Health Care Sys. LLC*, 2023 WL 2778295, at *1 (Del. Ch. Apr. 4, 2023).

[69] *See* Verified Compl., Dkt. No. 1 ("Compl.").

16

permanent injunction directing Sellers to comply with the agreements and enjoining termination of the TSA, and attorneys' fees pursuant to the prevailing party provision of the APA.[70] The Parties jointly requested expedition on April 6, 2022, which I granted on April 7, 2022.[71] Sellers filed their answer and counterclaims on April 22, 2022.[72] Sellers' countercomplaint brought eight causes of action, seeking a declaration affirming Sellers' conception of contractual offset rights, damages for breaching the APA by not remitting DPP Distributions, damages for breaching the TSA, a declaration that Sellers were entitled to terminate the TSA, damages for breach of the implied covenant of good faith and fair dealing, *quantum meruit* damages, the right to collect any damages from Buyers' parent organization, and attorneys' fees.[73]

On May 3, 2022, Buyers moved for summary judgment on all claims and counterclaims.[74] Buyers' answer to the counterclaims followed shortly.[75] Sellers cross-moved for summary judgment on May 24, 2022.[76] In the course of briefing the cross-motions for summary judgment, Buyers filed a motion for preliminary

---

[70] *Id.* ¶¶ 123–155.
[71] Stipulation and [Proposed] Order Governing Expedited Trial Schedule, Dkt. No. 18; Judicial Action Form, Dkt. No. 19.
[72] Defs.' Answer and Countercls.
[73] *Id.* ¶¶ 120–220.
[74] Pls.' Mot. Summ. J., Dkt. No. 31.
[75] Pls.' Answer.
[76] Defs.' Cross-Mot. Summ. J., Dkt. No. 42.

injunction on June 11, 2022.[77]  By letter, I informed the Parties that the motion for a preliminary injunction would be heard on July 12, 2022, alongside the motions for summary judgment.[78]  Briefing on the cross-motions for summary judgment and the motion for a preliminary injunction concluded on July 6, 2022.[79]

I held oral argument on July 12, 2022, and issued a Memorandum Opinion on August 1, 2022.[80]  In that Memorandum Opinion, I granted the Buyers' motion for a preliminary injunction but reserved decision on the cross-motions for summary judgment to allow the Parties to determine if expedition was still required.[81]  The Parties agreed that expedition was no longer necessary but disagreed as to whether a decision should be rendered on the record as it stood.[82]  Buyers requested that I permit additional discovery and briefing regarding the Parties' intent.[83]  Sellers disagreed.[84]  I instructed the Parties to perform discovery and supplement their motions for summary judgment.[85]

---

[77] Pls.' Mot. Prelim. Inj., Dkt. No. 51.

[78] Letter to Counsel, Dkt. No. 54.

[79] Pls.' Reply Br. Supp. Their Mot. Prelim. Inj., Dkt. No. 62.

[80] Judicial Action Form, Dkt. No. 75.

[81] *Steward I* at *11.

[82] Letter to The Honorable Sam Glasscock III from Michael A. Barlow, Dkt. No. 92 ("Pls.' Aug. 26, 2022 Letter"); Letter to The Honorable Sam Glasscock III from Lewis H. Lazarus, Dkt. No. 93 ("Defs.' Aug. 26, 2022 Letter").

[83] Pls.' Aug. 26, 2022 Letter at 2.

[84] *See* Defs.' Aug. 26, 2022 Letter.

[85] Tr. 11.29.22 Telephonic Status Conference, Dkt. No. 134; *see also* Tr. 10.25.2022 Telephonic Status Conference, Dkt. No. 123.

Supplemental briefing of the summary judgment motions began March 17, 2023,[86] and concluded March 31, 2023.[87] I held oral argument on the supplemented motions for summary judgment on May 9, 2023, and I consider the motions fully submitted as of that date.[88]

## II. ANALYSIS

"Under Court of Chancery Rule 56, summary judgment may be granted if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"[89]

"When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[90] As such, to divine the intent of the parties' to a contract, the Court always starts with the text.[91] "When the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[92] To do so, the Court will "read a

---

[86] *See* Pls.' Suppl. Br.

[87] *See* Pls.' Reply Br. Supp. Their Mot. Summ. J. and Opp'n Defs.' Cross-Mot. Summ. J., Dkt. No. 170.

[88] Judicial Action Form, Dkt. No. 176.

[89] *Roma Landmark Theaters, LLC v. Cohen Exhibition Co.*, 2021 WL 2182828, at *6 (Del. Ch. May 28, 2021) (quoting Ct. Ch. R. 56(c)).

[90] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[91] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[92] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[93]

"[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[94] Conversely, where there is only one reasonable interpretation of the contractual language, the contract is unambiguous.[95]

"[E]xtrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity" in an otherwise unambiguous contract.[96] However, if ambiguity is present, extrinsic evidence may be used to "arrive at a proper interpretation of contractual terms."[97]

Put simply, the contract in question anticipates the DPP to operate in discrete "Program Years." The Sellers interpret the APA to require proration of any DPP Distributions relating to the Program Year in which the Closing occurred, October 1, 2020 through September 30, 2021 (the "CPY"), on the basis of the fraction of that year each of the Parties owned the hospitals for whose services reimbursements were made. Per Sellers, this results in about 80% of payments relating to the CPY belonging to Sellers. The Buyers, for their part, note that the DPP Distributions

[93] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).
[94] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).
[95] *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).
[96] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).
[97] *Id.*

relating to the period set out above were not made until early 2022, and thus occurred in the Program Year after Closing occurred; and, per their reading of the APA, all the reimbursements belong to Buyers. In my assessment of the motion for a preliminary injunction in *Steward I*, I considered Sellers' chances of prevailing on the merits of the DPP issue and concluded that success was "substantially conceivable."[98] I specifically adopt, without repeating in full, the analysis of this issue in *Steward I*. The additional evidence produced since that time has not changed my thinking on the matter and served only to solidify it. Simply put, the Sellers' interpretation of the DPP Provision is correct; this is clear when the agreement is examined as a whole, even in light of the Buyers' extrinsic evidence interpreted in their favor. The Parties created a scheme for prorating payments relating to the CPY, which operates under the Sellers' construction of the contract but is largely impracticable under that of the Buyers.

As stated, the allocation of DPP Distributions depends on the interaction of the "Closing" and "Program Year."[99] Of those, only "Program Year" is in question.[100] The APA provides that "[f]or purposes of this Section 8.22, 'Program Year' means the program year (i.e., October 1 through September 30) in which

---

[98] *Steward I* at *7.
[99] *Id.* at *8.
[100] Compl. ¶ 60; Defs.' Answer and Countercls. ¶ 135.

assessments are collected and payments are made with respect to the Healthcare Business in connection with the Florida Directed Payment Program."[101]

The Parties here agree that this provision is unambiguous but disagree on its meaning. Buyers' interpretation hews closely to the plain text of the "Program Year" clause in isolation but is problematic viewed in light of the DPP Provision and APA as a whole. In context, I find the Sellers' interpretation is the logical reading of the DPP Provision.

Buyers contend that based upon the plain language of the "Program Year" definition they are entitled to the entirety of the DPP Distributions. Specifically, "Closing" occurred on August 1, 2021, and thus the Program Year in which the Closing occurred—the CPY—was October 1, 2020 to September 30, 2021. However, the first round of "assessments and distributions" began in *October 2021*, reimbursing hospitals for procedures undertaken during the prior CPY.[102] Noting that "Program Year" is defined by when "assessments are collected and payments are made," the Buyers contend that the "DPP Payments" all relate to the "Program Year after the Program Year in which the Closing occurs"—October 1, 2021 to September 30, 2022—which, under the APA, belong to Buyers.

---

[101] APA § 8.22.

[102] Pls.' Br. Further Supp. Their Mot. Summ. J. 20; Defs.' Answering Br. 44, Dkt. No. 43.

This reading, focusing myopically on the definition of Program Year, leads to incongruities. Notably, given that there were no assessments or distributions in the period between October 1, 2020 and September 30, 2021, under the Buyers' reading that period was *not* a Program Year. But Closing undoubtedly occurred during that non-Program Year period. In that case, there was no "Program Year in which the Closing occurs." Absent a "Program Year in which the Closing occurs," the DPP Provision is nugatory, as the three periods of distribution—Pre-Closing, Straddle, and Post-Closing—are defined in relation to the "Program Year in which the Closing occurs."[103]

Further, though this is not the case here, the DPP Provision leaves open the possibility that "assessments are collected" and "payments are made" in different October 1 through September 30 periods. In such an instance, there would be no contractual "Program Year" relating to those payments. Thus, Buyers' construction is unworkable under the proration scheme read as a whole.

The Sellers argue that the prepositional phrase "in which" in the Program Year definition should more properly be read as "for which."[104] Akin to taxes or an end of year bonus, where "in" is used to refer to the year *accrued* rather the year

---

[103]*See* APA § 8.22 "Program Year in which the Closing occurs (the 'DPP Straddle Distributions')," "Program Year after the Program Year in which the Closing occurs (the 'Post-Closing DPP Distributions')," "Program Year prior to the Program Year in which the Closing occurs (the 'Pre-Closing DPP Distributions' . . . ).".
[104] Defs.' Answering Br. 35–36.

paid, "in" here, in Sellers' view, arises out of or relates to a previously completed time period.[105] Thus, in their interpretation, "'Program Year' means the program year (i.e., October 1 through September 30) [*for*] which assessments are collected and payments are made with respect to the Healthcare Business in connection with the Florida Directed Payment Program."

As explained above, this reading harmonizes the contract as a whole. APA Section 8.22 memorializes the Parties' intent that reimbursements or distributions "with respect to the Healthcare Business arising out of, attributable to or received in connection with the [DPP] and *relating to* the Program Year in which the Closing occurs" are DPP Straddle Distributions,[106] for which the Parties provided a proration formula based upon the fraction of the Program Year for which each party owned the facilities to which the DPP Distributions "relate." "Relating to" suggests that the DPP Distributions could take place at any time, the operative fact being the Program Year in which incurred. The Buyers' construction of the Program Year definition would frustrate this expressed intent.

Under Sellers' definition, October 1, 2020 through September 30, 2021, comprises the Program Year in which Closing occurred, and relating to which "assessments are collected and payments are made." This reading gives meaning

---

[105] *Id.* at 3–4, 36.
[106] APA § 8.22 (emphasis added).

24

to all the language and avoids the absurd results that Buyers' construction entails.

Thus, DPP Distributions relating to the CPY of October 2020 through September

2021 would be "Straddle Distributions" divided on a "my watch, your watch"

basis.

Put differently and as stated in my prior Memorandum Opinion,

[T]he [Buyers]' reading of the Program Year definition is unworkable in context to the rest of the APA's DPP Distribution provision. No assessments were collected and no payments were made during the October 1, 2020 through September 30, 2021 time period. Therefore, if the [Buyers] are correct that Program Years are defined by when "assessments are collected and payments are made," that would mean that there was no "Program Year in which Closing occurs." And if there is no "Program Year in which Closing occurs" (i.e. DPP Straddle Distributions), then there can be no "Program Year after the Program Year in which Closing occurs" (i.e. Post-Closing DPP Distributions), and there can be no "Program Year prior to the Program Year in which Closing occurs" (i.e. Pre-Closing DPP Distributions).

Indeed, for there to be a "Program Year in which Closing occurs" under [Buyers'] reading, Closing would have had to be October 1, 2021 or later. And for there to be a "Program Year prior to the Program Year in which Closing occurs" under [Buyers'] reading, Closing would have had to be October 1, 2022 or later. But the parties negotiated a Termination Date of October 1, 2021, after which either party could terminate the APA if Closing had not yet occurred. The APA allows for an extension of the Termination Date only until December 1, 2021. Thus, under the [Buyers'] reading, the "DPP Straddle Distributions" could only exist if the parties closed the APA on the Termination Date or exercised an extension. And "Pre-Closing DPP Distributions" could only exist if the parties blew the Outside Date by a full year. The existence of a Termination Date suggests that the parties intended to close the Sale by that date. It is unlikely that

25

the parties negotiated a bespoke allocation of DPP Distributions that would only be relevant if they failed to do so by a full year.[107]

In light of this understanding, Sellers' reading, in the context of the APA, is the reasonable interpretation, based on the four corners reading of the contract itself.

I do not find the language ambiguous, reading the contract as a whole. The Parties have provided extrinsic evidence, which to my mind only reinforces my understanding of the meaning of the APA. To the extent I considered extrinsic evidence, my decision would be the same.

Here, the crucial commercial context is the structuring of the DPP itself as it relates to the timing of assessments and distributions. Buyers suggest that during negotiations, the timing and structure of DPP Distributions was unsettled. In a Miami Market Proforma EBITDA Analysis that Sellers sent to Buyers in January 2021, Sellers sent an overview to the DPP.

> This DPP requires each participant hospital to pay an assessment (the non-federal share) into a local provider participation fund ("LPPF"). Each LPPF's membership is comprised of the hospitals in the respective counties mentioned above. After collecting provider fees from its member hospitals, the LPPF (via an intergovernmental transfer) sends the total collected provider fees to the state of Florida. The state draws down federal matching funds (the Federal Share) based on the applicable Federal Medical Assistance Percentage. The total non-Federal and Federal share is then distributed to Managed Medicaid payers, who then distribute these fees to the LPPF members.

---

[107] *Steward I* at *10.

The distribution of the pool of funds is based on Medicaid Managed Care paid in-network inpatient admission and outpatient visits.

Although authorization for the state Medicaid agency was granted as a result of emergency powers utilized by the Governor, the Florida legislature will ultimately need to formally authorize implementation of the DPP through a budget proviso during the 2021 legislative session in March — May of 2021. Furthermore, the bill has received bipartisan support as a beneficial program. The Centers for Medicare and Medicaid Services must approve the DPP; assuming CMS approves the DPP, it is expected that eligible hospitals will receive their first quarterly DPP payment beginning May 2021. Hospitals would receive quarterly DPP payments, based on each hospital's inpatient and outpatient utilization in the prior quarter.[108]

Buyers argue that this shows that payments were expected to be made before the closure of the relevant measurement period.[109] However, even in the light most favorable to the Buyers, it is clear that payments relate to *past services*. Irrespective of when paid, DPP payments are tied to—"arise out of" in the language of the contract—the past provision of services, and reimbursements relate to those services previously performed.

In deposition, Buyers' deal counsel testified that he spoke with a lobbyist who gave him a "general overview of how the DPP program works." He was told that

because CHS had approved this within the year started October 1, 2020, through September of 2021, it was possible that assessments could be made collected [*sic*] from the hospitals during that time period. So just to repeat that, that it was possible that assessments and

---

[108] Schulman Aff. Ex. 5 at STE_DE_0002872
[109] Pls.' Suppl. Br. 30.

distributions could be paid, certain assessments could be paid into the program during the time period of October 1, 2020, through September 30, 2021, and distributions paid out during that same time period and that it could also be the year following. This is the most likely outcome in this lobbyist's mind was that it might be that second time period.[110]

This conversation, in the light most favorable to the Buyers, suggests that there was uncertainty of when assessments and distributions would be paid, but it does not speak to the purpose of those payments or their retroactive nature.

Notably, the Parties negotiated knowing the retroactive nature of prospective DPP Distributions.[111] Thus, the Parties expected that distributions for periods between October 1 and September 30 would arrive after each period. This corroborates Sellers' reading of the DPP Provision as the logical reading of the APA.

Moreover, the Parties' negotiations, set out in Section I.A.3., are supportive of the Sellers' interpretation of the contract. Buyers' reading of the contract represents the state of play in the negotiations *before* the DPP became, practically speaking, a *fait accompli*, which made the hospitals more valuable. At that point, Sellers walked away from the contemplated deal, and used their improved leverage

---

[110] Wales Dep. 140:4–141:5.

[111] CMS Approval Letter at 5.

28

to renegotiate. One aspect of that renegotiation was Sellers' proposal that the Parties divide DPP reimbursements based on the date of sale. Specifically, Buyers' draft of June 14 responsive to this proposal demonstrates that they intended to pro rate DPP Distributions "*relating* to the program year (i.e., October 1 through September 30) in which the Closing occurs."[112] "Relating to" shows that, irrespective of when payments were made, DPP Distributions were tied to the underlying services they reimbursed for. Buyers' reading of the language at issue would make the proration provision illusory. If I were to consider this drafting history, it would only reinforce my view that the Parties agreed to proration for distributions relating to the Straddle Year, and not prorations of reimbursements highly unlikely to occur.

The Parties also provided extrinsic evidence of Buyers' post-Closing conduct.[113] Even if I were to consider this evidence, it further supports that Sellers' reading of the DPP Provision accurately represents the Parties' intentions as the evidence clearly demonstrates that, immediately following the Closing, Buyers adopted and acted in accordance with Sellers' interpretation.[114]

---

[112] Schulman Aff. Ex. 28 at ALSTON00002211 (emphasis added).

[113] Defs.' Suppl. Br. Supp. of Defs.' Cross-Mot. Summ. J. and Opp'n Pls.' Mot. Summ. J. 18–25, Dkt. No. 165 ("Defs.' Suppl. Br."); Pls.' Suppl. Br. 20–21.

[114] *See, e.g.,* de la Torre Dep. 29:1–32:12, 119:4–19; Second Suppl. Grzaslewicz Aff. Ex. 42 at 165:24–166:5, Dkt. No. 156.

# III. THE AAPP ISSUE

The Parties also submitted their dispute over reimbursements associated with CMS's Accelerated and Advanced Payment Program ("AAPP Program") for summary judgment. The AAPP Program was a program in which CMS advanced Medicare funds that would, at least in part, be recouped from recipients at a later date.[115] Prior to Closing, Sellers received these advancements.[116] After Closing, the Buyers allegedly reimbursed or were on the brink of reimbursing CMS for amounts that the CMS had advanced to the Sellers before Closing.[117] The Buyers are entitled under APA Section 8.16 to recover from the Sellers the funds that were advanced to Sellers but recouped from Buyers.[118] Section 8.16 provides the process for Buyers' recoupment from Sellers:

> At the beginning of each calendar month following the Closing Date, or at some other mutually agreeable time, and until the later of September 30, 2022 or the latest date on which any AAPP Reimbursement Amounts would be due to CMS in accordance with CMS' publicly announced AAPP repayment terms and conditions (the "AAPP Extension Date"), Buyers shall provide Sellers with a written statement setting forth the actual or anticipated AAPP Reimbursement Amounts to be paid by Buyers or recouped by CMS from any Buyer (or its Affiliates) in that month, in the immediately following month, and/or as a result of identified corrections regarding past months (each a "Monthly AAPP Statement"), together with reasonable supporting documentation (e.g., remittance advices reflecting the AAPP Program recoupment from the applicable month(s)).

---

[115] Defs.' Answering Br. 11.
[116] Defs.' Answer and Countercls. ¶ 50.
[117] Compl. ¶ 4.
[118] APA § 8.16.

The Buyers contend that the Sellers did not reimburse them for the requisite payments and that Sellers must therefore pay them.[119] Sellers contend that Buyers did not pay CMS and that the amounts owed to CMS are not "anticipated" within the meaning of Section 8.16.[120] Accordingly, Sellers argue that they need not make payments to Buyers.

Thus, the contention here is not whether paid amounts must be reimbursed, but rather, what amounts were actually paid or anticipated, and the proof required to evidence such payments.[121] As such, and given the state of the record, this is a highly fact intensive dispute better suited for trial than summary judgment. Accordingly, I deny the cross-motions for summary judgment on the AAPP issue.[122]

## IV. CONCLUSION

With respect to the allocation of DPP Distributions relating to the year ending September 30, 2021, the Sellers' motion for summary judgment is granted and the Buyers' denied. With respect to the AAPP Program issues, the cross-motions are denied. The Parties should provide an appropriate form of order.

---

[119] Pls.' Suppl. Br. 31.
[120] Defs.' Suppl. Br. 38–42.
[121] *Id.*
[122] *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969).